EPISCOPAL THEOLOGICAL SEMI-
NARY OF THE SOUTHWEST
et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent.

CONTINENTAL OIL COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

Nos. 14581, 14588.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 8, 1959.

Decided June 18, 1959.

Mr. John F. Jones, of the Bar of the Supreme Court of Oklahoma, Tulsa, Okl., *pro hac vice*, by special leave of court, and Mr. William J. Grove, Washington, D. C., with whom Mr. Carrol L. Gilliam, Washington, D. C., was on the brief for petitioners.

Mr. Roland B. Voight, Houston, Tex., also entered an appearance for petitioner in No. 14588.

Mr. Howard E. Wahrenbrock, Sol., Federal Power Commission, with whom Messrs. Willard W. Gatchell, General Counsel, Federal Power Commission, W. Russell Gorman, Asst. Gen. Counsel, Federal Power Commission, and Robert M. Weston, Atty., Federal Power Commission, were on the brief for respondent.

Before Mr. Justice REED, retired,* and PRETTYMAN, Chief Judge, and FAHY, Circuit Judge.

* Sitting by designation pursuant to the provisions of Sec. 294(a), Title 28 U.S.Code.

REED, Associate Justice.

This is an appeal by more than some seventy independent producers of natural gas all of whose properties are in the Woodland gas field, Harrison County, Texas, from two orders of the Federal Power Commission. One producer, Stanolind Oil and Gas Company, is not only a producer, i. e., owns certain gas producing land or rights in the field, but also is an operator, i. e., one who sold under a twenty-year contract and regularly delivered its own gas and that of other producers involved to the Mississippi River Fuel Corporation for handling and transmission in interstate commerce. One nonoperating owner, Continental Oil Company, joined with Stanolind in the sales contract.

This contract, entered into April 3, 1951, contains a price escalation clause which calls for gradual raises of the price at two, three or four year intervals from twelve to fifteen and a half cents for each one thousand cubic feet. After the decision of the Supreme Court of the United States in the Phillips Petroleum case on June 7, 1954,[1] which held that sales and deliveries within the producing state by producers and their intermediaries for resale by distributing companies are in interstate commerce, regulable by the Federal Government and covered by § 4 of the Natural Gas Act, 15 U.S.C.A. § 717c, Stanolind Oil and Gas Company, now known in this record, after a change of name, as Pan American Petroleum Corporation filed the sales contract between themselves and Mississippi River Fuel Corporation with the Federal Power Commission.

The contract was filed October 18, 1954, as Stanolind's Gas Rate Schedule No. 31, pursuant to an order of the Commission of July 16, 1954, requiring independent producers to file as rate schedules all contracts for sale of their gas covered by the Act under the Phillips decision.[2] The Regulations of the Commission required the filing of a copy of the contract and a showing of the service provided and the rates and charges.[3] These were the rate schedules. Regulatory provision was made for changes in the rate schedules. The applicable sections appear below.[4] The contract was received and accepted by the Commission pursuant to Regulation 154.101.[5]

---

1. Phillips Petroleum Corp. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

2. Continental Oil Co. likewise filed the contract as its Schedule No. 107. Proceedings in that case followed the same course as those of Pan American and need not be detailed.

3. Regulations under Natural Gas Act, §§ 154.91–154.102.

4. § 154.93 Rate Schedule Defined
   "For the purpose of Sections 154.92 through 154.101 hereof 'Rate Schedule' shall mean the basic contract and all supplements or agreements amendatory thereof, effective and applicable on and after June 7, 1954, showing the service to be provided and the rates and charges, terms, conditions, classifications, practices, rules and regulations affecting or relating to such rates or charges, applicable to the transportation of natural gas in interstate commerce or the sale of natural gas in interstate commerce for resale subject to the jurisdiction of the Commission."

§ 154.94 Changes in Rate Schedules
"(a) No change shall be made in any rate, charge, or service in effect on and after June 7, 1954, for the interstate transportation or sale of natural gas in interstate commerce subject to the jurisdiction of the Commission by any independent producer required to file rate schedules pursuant to Section 154.92 hereof, without first filing a change in rates pursuant to Section 4(d) of the Natural Gas Act and in accordance with this section.

\* \* \* \* \* \* \*

"(c) The operation of any provision of the rate schedule providing for future or periodic changes in the rate, charge, classification, or service after June 7, 1954, or the operation of any like provision in any initial rate schedule filed after June 7, 1954, shall constitute a change in rate schedule."

5. § 154.101 Acceptance for filing not approval
   "Acceptance for filing of any rate schedule or part thereof, or of a Notice of Cancellation or Termination, is not to

The incident that brought on this litigation was a filing on March 2, 1955, of a notice of a change in the rate schedule. This was done in involuntary compliance with sections 154.94(a) and (c) of the Regulations just referred to. It proposed a raise from 13 cents to 13.5 cents per MCF, in accordance with the provisions of the contract's escalation clause. The filing was done under protest and with reservation of a right to object. The Commission suspended the change under section 4 of the Natural Gas Act, particularly subsection (e).[6] This was the first order challenged. A consolidated hearing was held thereafter on the reasonableness of the changes of rate filings of Pan American and Continental. The decision thereon was the second order challenged. The Commission found against petitioners on both orders, approving so far as is here material the Examiner's prior decision.[7]

The Examiner and the Commission held that the contract, including the escalation clauses, filed in accordance with 15 U.S.C. § 717c(c), 15 U.S.C.A. § 717c(c)[8] was subject to the hearing as ordered by the Commission under 15 U.S.C. § 717c(e), 15 U.S.C.A. § 717c(e), set out in note 6, supra, on the attempted use of the escalation clause by the operator, Pan American Petroleum Corporation, to increase its rate.[9] In adopting the Examiner's decision, the Commission said:

"It is sufficiently apparent by now that, both as a matter of law and

be construed as approval by the Commission, nor to serve in lieu of any requirements under Section 7 of the Natural Gas Act."

6. 15 U.S.C. § 717c(e), 15 U.S.C.A. § 717c(e):
"Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, or State commission, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect: * * * At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."
Pan American Petroleum Corp., 19 F.P.C. 519, 525:
"On September 29, 1955 the Commission issued an order making Supplement

No. 8 to Continental's F.P.C. Rate Schedule No. 107 effective as of September 3, 1955 subject, however, to refund under bond of such portion of the increase as might be found not justified. A similar order was issued with respect to Supplement No. 10 of Stanolind's F.P.C. Rate Schedule No. 31 on October 24, 1955. Thus that rate Schedule also became effective on September 3, 1955 subject to an undertaking by Stanolind to refund any part of such increase found to be unreasonable and unlawful."

7. The F.P.C. decision of April 14, 1958, and the Presiding Examiner's decision of February 8, 1957, appear in 19 F.P.C. 519 and 523.

8. 15 U.S.C. § 717c(c), 15 U.S.C.A. § 717c(c):
"Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services."

9. The Examiner said:
"It seems clear that to accept the contention of the Applicants that 13½¢ is an initial rate not subject to the provision of suspension and the other provisions of Section 4 of the Act would virtually

Commission regulatory policy, every change of an existing rate to a different price by reason of a step-up escalation clause in a sales contract constitutes a change in rate, and every such change is subject to suspension by virtue of Section 4(e) of the Act. See, e. g., Mississippi River Fuel Corporation, 2 F.P.C. 170, 176; affirmed Mississippi River Fuel Corp. v. Federal Power Commission [8 Cir.], 121 F.2d 159; Section 154.94(c) of F.P.C. Regulations under the Natural Gas Act." 19 F.P.C. at 521.

It was determined also that the companies had not carried their burden of showing under § 4(e) of the Natural Gas Act, 15 U.S.C. § 717c(e), 15 U.S.C.A. § 717c(e), note 6, supra, that the increases sought were just and reasonable.[10]

Rehearing of the Commission's orders suspending and denying the requested increase was requested by an appropriate application pursuant to § 19 of the Natural Gas Act.[11] It was denied June 6, 1958, 19 F.P.C. 917.

Petitioners' objections drawn from their Statement of Points are basically two:

"I. The suspension order is invalid; the Commission had no jurisdiction or authority to proceed under Section 4 of the Natural Gas Act because the 13.5¢ contract price is not a 'change' of 'rate schedule.'

"II. The Commission erred in concluding that Petitioners failed to sustain the burden of proving the contract price just and reasonable,

and in 'disallowing' receipt of the contract price."

Other points were made which really fall within those main points.

"III. The Commission unlawfully modified Petitioners' contract without having made, as required by Section 5 of the Act, an express finding that the price is unreasonable."

This turns upon the same issue as Point I in the above text. If the Commission may deal with the petitioners' notice of a change in the rate schedule under Section 4 of the Act, note 6, supra, petitioners' objection that Section 5, in so far as it requires a finding by the Commission that the rate is unreasonable, was disregarded by the Commission, falls.[12]

"IV. The Commission failed to make basic and ultimate findings of fact and conclusions as required by substantial evidence with the result that the Commission acted arbitrarily, abused its discretion, and violated Section 8(b) of the Administrative Procedure Act of 1946, 60 Stat. 242, 5 U.S.C.A. § 1007(b)."

This point seems to be subsidiary to and controlled by petitioners' Point II in the text. Petitioners argue that their evidence as to reasonableness of the price produced by the escalation clause required a finding of its reasonableness. It is charged the Commission ignored this evidence in reaching its conclusion that petitioners had failed to carry the required burden of proof under § 4 of the Act to show the rate increase by the escalation clause was reasonable.[13] This it is argued violated Section 8(b) of the

nullify those provisions. To permit the terms of an initial contract (or rate schedule) to govern permanently the future rates to be charged thereunder insofar as Section 4 is concerned would leave the Commission powerless to exercise its functions under that section. To escape entirely its responsibilities under Section 4 and avoid the necessity of establishing the fairness and reasonableness of future increases in rates as contemplated therein, a natural-gas company

would need only to include in the initial contract provision for all remotely conceivable future increases." 19 F.P.C. at 534.

10. 19 F.P.C. at 521 and 538.

11. 15 U.S.C. § 717r(a), 15 U.S.C.A. § 717r (a).

12. See 15 U.S.C. § 717d, 15 U.S.C.A. § 717d.

13. See note 6, supra.

Administrative Procedure Act.[14] That subsection assures an opportunity to litigants to submit to the officers of an agency proposed findings, exceptions and reasons therefor. The petitioners presented their petition for rehearing to the Commission and have failed to point out any alleged violations of § 8(b) of the Administrative Procedure Act other than that the Commission ignored "much of this evidence." We think our consideration of petitioners' Point II disposes also of this exception.

■ *First.* We turn then to petitioners' Point I that Section 4 of the Natural Gas Act is inapplicable because notice that the escalation clause of the contract would be used to increase its gas rates is not a change of rate schedule under section 4(d) of the Act.[15] The petitioners assert: "As *filed* with the Commission in October, 1954, and *made effective* as a rate schedule, Petitioners' contract provided for the mutually agreed-upon price of 13.5¢ on April 3, 1955." That is correct. But up to March 2, 1955, the rate fixed by the rate schedule was 13¢.

■ Regulations by the Commission regarding rate schedules and changes therein were authorized by the Natural Gas Act, Sec. 4(c).[16] Under that authority the Commission made the regulations set out in note 4, supra, forbidding changes without filing a change in rates and specifically declaring in regulation 154.94(c) that operation of any future change in rate, such as the escalation clause here involved, shall constitute a change in rate schedule. Faced by this regulation, petitioners attack its validity on the ground that section 4 of the Act

contemplates "physical replacement" of the old schedule. Administrative bodies can be authorized to pass regulations to enforce the provisions of acts such as the Natural Gas Act "within the permissible bounds of administrative construction."[17] We think this regulation is of that type and valid. The definition of "rate schedule," as stated by Regulation § 154.93, note 4, supra, upon which petitioners rely, was adopted by the Commission. If the Commission had power to adopt that regulation, it had the power to adopt the succeeding regulation, § 154.94(c), note 4, supra, making the operation of an escalation clause a change in rates.

■ Furthermore, section 4, subsection (c) of the Act, note 8, supra, requires "schedules showing all rates and charges for any transportation." That must mean the then applicable rate. Section 4(d), see note 15, supra, requires that the public must be kept informed of the "changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect." No change may be made in a "rate" or "schedule then in force," without notice to the Commission and the public. This language is persuasive that forehanded contractual provisions cannot modify the regulatory provisions of the Act as urged by petitioners. The purpose is to advise the public of a change in the current rate. Petitioners' interpretation would run counter to the language and purpose of Congress to maintain the "lowest reasonable rates."[18] To approve escalation clauses in long term contracts when the contracts were

---

14. 5 U.S.C. § 1007(b), 5 U.S.C.A. § 1007 (b).

15. 15 U.S.C. § 717c(d), 15 U.S.C.A. § 717c (d):
  "Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for

public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. * * *"

16. 15 U.S.C. § 717c(c), 15 U.S.C.A. § 717c (c), see note 8, supra.

17. Morrissey v. Commissioner, 296 U.S. 344, 354–355, 56 S.Ct. 289, 80 L.Ed. 263; cf. United States v. Howard, 352 U.S. 212, 77 S.Ct. 303, 1 L.Ed.2d 261.

18. Sec. 5(a) of the Act.

originally filed, would determine rates for indefinite future periods. Fair adjustments of escalation-clause rates to future costs and earnings would be impossible at that time. Public utility rates cannot be fixed solely by bargaining between producers and distributors. The governmental agency also has the duty to protect the consumer.

But petitioners say that the Supreme Court's decision in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373, rules the question as to whether the actuation of the escalation clause is a change of rate or schedule under § 4 of the Act. They read the case as authority for saying, in petitioners' words, "where a change of price *is not* a change *to* the contract under contract law, then such events likewise are *not* 'changes' of a filed contract or rate schedule or a 'new schedule' under Section 4(d) of the Act, and notice is not required and may not be filed."

Petitioners' deduction from the Mobile case, we think, is not applicable to a contract providing for the use of an escalation clause. The issue in the case was whether a natural gas company furnishing gas to a distributing company could unilaterally change a long-term contract rate by filing a new rate schedule with the Commission. 350 U.S. at page 333, 76 S.Ct. 375. The Commission's basic power is to regulate any rate it determines is "unjust, unreasonable, unduly discriminatory, or preferential." 350 U.S. at page 341, 76 S.Ct. at page 379. This left the regulated company free, subject to § 4 of the Act and action of the Commission thereunder, to change any rate it had the power, vis-a-vis the distributor, to change (350 U.S. at page 342, 76 S.Ct. 379), but the Court held the company had no power by virtue of general law unilaterally to so change its contract without the consent of the distributor. 350 U.S. at page 342, 76 S.Ct. 379.[19]

In the Memphis case, note 19, supra, the agreement between buyer and seller of gas contained this clause:

"All gas delivered hereunder shall be paid for by Buyer under Seller's Rate Schedule [the appropriate rate schedule designation is inserted here], *or any effective superseding rate schedules* on file with the Federal Power Commission." (Italics supplied.) 358 U.S. at page 105, 79 S.Ct. at page 196.

There was no sliding scale of rates.[20] The Court of Appeals held that new rates under this long-term contract must be negotiated with and agreed to by the buyer before the new rates can be filed and reviewed under the Act, § 4(d) and (e). The Supreme Court reversed. It pointed out that Memphis differed from Mobile in that Memphis had a fixed rate but "effective superseding" rates also. It quoted its holding in Mobile:

"* * * except as specifically limited by the Act, the rate-making powers of natural gas companies were to be no different from those they would possess in the absence of the Act: to establish *ex parte*, and change at will, the rates offered to prospective customers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer. No more is necessary to give full meaning to all the provisions of the Act: consistent with this, § 4(d) means simply that *no* change—neither a unilateral change to an *ex parte* rate nor an agreed-upon change to a contract—can be made by a natural gas company without the proper notice to the Commission. * * *" 358 U.S. at pages 110–111, 79 S.Ct. at page 198.

and added:

"Section 4(d) provides for the giving of notice of any change 'in

19. See United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div., 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153.

20. Memphis Light, Gas and Water Div. v. Federal Power Comm., 102 U.S.App.D.C. 77, 250 F.2d 402, 404; 358 U.S. at 109, 79 S.Ct. 194.

any such rate  *  *  *  or contract relating thereto  *  *  *' by filing new rate schedules with the Commission and keeping them open for public inspection.  And § 4(e) authorizes Commission review of the lawfulness of any such changed rate.  The record before us affirmatively shows that United in the filings here at issue has complied with all the duties which these sections in terms impose upon it, and there is nothing in these sections which even remotely implies that § 4(d) and (e) procedures are applicable to the filing and review of only those rate changes whose amount has been agreed upon by the seller and buyer."  Id., 358 U.S. at pages 111–112, 79 S.Ct. at page 199.

It was then concluded:

'Mobile makes it plain that '§ 4(d) on its face indicates no more than that *otherwise valid* changes cannot be put into effect without giving the required notice to the Commission.'  350 U.S., at pages 339–340, 76 S.Ct. at page 378.  (Italics supplied.)  The necessary corollary of this proposition is that changes which in fact are 'otherwise valid' in the light of the relationship between the parties can be put into effect under § 4(d) by a seller through giving the required notice to the Commission.  Mobile expressly notes that in the absence of any contractual relationship rates determined *ex parte* by the seller may be filed under § 4(d).  350 U.S. at page 343, 76 S.Ct. at page 380."  Id., 358 U.S. at page 112, 79 S.Ct. at page 199.

These cases leave the controlling issue here whether there was a change in the rate.

As we indicated above in considering the regulations we think there was a change in rate.  It was an agreed-upon change, it is true.  And although the original schedule had foretold the coming of the change, it took an amendment to advise the public and the Commission that the new rate was going into operation.  We see nothing in the Mobile or Memphis cases that hold otherwise.  Cf. Sun Oil Co. v. Federal Power Comm., 5 Cir., 266 F.2d 222, 225;  Kerr-McGee Oil Industries v. Federal Power Comm., 10 Cir., 260 F.2d 602.

■ *Second.*  Point II of petitioners' objections to the Commission's order deals with the Commission's determination that petitioners failed to sustain their burden under § 4(e) of the Act to show the proposed new rate is just and reasonable.[21]  The petitioners argue that the "just and reasonable" rate required to be proven by petitioners under § 4 of the Act may be established by different proof than "the lowest reasonable rates" under § 5.[22]  The words "just and reasonable," as applied to limitation of rates, appear both in § 4 and § 5.  They are used in § 5 as a guide to the determination of rates.[23]  But we need not decide whether there is a difference in proof required between the "just and reasonable" and "lowest reasonable."  Since we hold that § 4 is applicable, the Commission's decision may be tested under "just and reasonable," and we may also assume that, as petitioners urge, there may be a zone of reasonableness inherent in such a test.  That is, the Commission could consider as just and reasonable various rates within the zone.  Such choices are not at issue here.  The question in the second point is whether the petitioners' evidence is sufficient to compel us to reverse the Commission's conclusion that the evidence was not enough to sustain the proposed increase.[24]

21.  See note 6, supra.

22.  Under § 5 the Commission, after hearing, "may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

23.  See Federal Power Comm. v. Natural Gas Pipeline Co., 315 U.S. 575, 581–582, 62 S.Ct. 736, 86 L.Ed. 1037.

24.  "Likewise, the exceptions of Pan American and Continental to the presiding examiner's determination that the compa-

As the Examiner pointed out in his decision, 19 F.P.C. 523, "[i]t is beyond dispute that the terms of the agreement were arrived at as the result of arm's length bargaining." P. 540. The petitioners had expert economic evidence that the increase allowed by the escalation clause was much less than the rise in the value of gas from 1951 through 1954. P. 541. There was also evidence that the price sought "falls within the range of prices paid to other producers in the pricing area." P. 544. All of this was, of course, pertinent.

The Commission sustained the examiner's conclusion, however, agreeing with him that since petitioners "have wholly failed to offer any evidence respecting their investment in plant or their costs of operations," [25] a fair balance could not be struck between producers and consumer interest.

The decisions, we think, support this view. As the Supreme Court said in Federal Power Comm. v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743.

"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commis-

sion's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

A concurrence highlights this conclusion, 315 U.S. at page 604, 62 S.Ct. at page 751.

"The rule of Smyth v. Ames [169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819] as construed and applied, directs the rate-making body in forming its judgment as to 'fair value' to take into consideration various elements —capitalization, book cost, actual cost, prudent investment, reproduction cost. * * * The rule of Smyth v. Ames, as interpreted and applied, means merely that all must be considered. What, if any, weight shall be given to any one, must practically rest in the judicial discretion of the tribunal which makes the determination."

This statement as to the power of the Commission was repeated in Federal Power Comm. v. Hope Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333.

■■ What the Commission has done is to say that petitioners must make a showing as to its operations. It seems to us reasonable to make such a requirement. The primary aim of the Natural Gas Act is "to protect consumers against exploitation at the hands of natural gas companies." [26] One aid to such an aim is to weigh the needs of the gas companies by an examination of its costs and profits. What better test could there be as to the reasonableness of existing or proposed rates to a company than a careful analysis of the evidence as to its recent earnings? [27] That is one of the elements of any rate-testing method.

nies had failed to sustain their burden of showing that the proposed increased rates are just and reasonable under our opinion in Matter of Union Oil Company of California, et al., 16 F.P.C. 100, and the court's decision in City of Detroit v. Federal Power Commission, 97 U.S.App. D.C. 260, 230 F.2d 810, raise no material point not sufficiently dealt with in the presiding examiner's decision. We conclude that the companies have not shown

their proposed increased rates are justified, nor can they until they meet the requirements of these decisions." 19 F.P. C., at 521.

25. Id., 544 and 521. See note 24, supra.

26. Id., 320 U.S. at page 610, 64 S.Ct. at page 291.

27. Cf. Bel Oil Corp. v. Federal Power Comm., 5 Cir., 255 F.2d 548; City of Detroit v. Federal Power Comm., 97 U.S.

■ *Third.* The petitioner Continental Oil Company objects to the proceeding by the Commission under § 4(e), see notes 2 and 6, supra, on the special ground that the section requires "a statement in writing of its reasons" for such suspension. Continental argues that the statement made in the case at bar was only a "hypothetical statement copied almost verbatim from statutory language," that the corporation could not know what objections to meet. Subject to all reservations and protests as to the necessity for filing, Continental filed its "Change in Rate Schedule," pointing out that it was a "fixed escalation" clause of the contract, providing for a half cent increase per MCF. It asserted that the price was reached by arm's length bargaining, that other less available gas sold for more and that the escalation was reasonable. Tables showed the volume sold and money received based on present and increased price. Nothing was shown as to the expenses of the operation.

The Commission ordered a public hearing and suspended the increase pursuant to sections 4 and 15 of the Natural Gas Act and the Commission's Rules and Regulations, 18 CFR, Chap. 1, after finding:

> "The increased rates and charges proposed in the aforesaid filing [have] not been shown to be justified, and may be unjust, unreasonable, unduly discriminatory, or preferential, or otherwise unlawful."

The rules, § 154.63(3), give detailed instructions for data to be submitted with changes in a tariff too long for inclusion here but covering sales volume, revenue, working capital, expenses, and a recent twelve-months balance sheet. The burden is upon the applicant for an increase under § 4. We have no doubt that the order of suspension fully advised petitioners of the information required to establish the necessity for the increase. Cf. Phillips Petroleum Co. v.

Federal Power Comm., 10 Cir., 227 F.2d 470, 474. The decision of the examiner discussed above certainly was specific. No reason appears why the petitioners could not meet the requirements.

■ *Fourth.* Another contention of Continental may be shortly answered. This contention is that another independent producer in the same field, Gulf Oil Corporation, selling to the same buyer under the same contract, filed on February 4, 1955, a change in Rate Schedule asking for similar reasons the approval of the periodic escalation clause as applied to it. On April 6, Gulf was advised that the raise requested had become effective as requested.

Obviously, any such arbitrary differentiation without any distinction as to the proceeding is not permissible.[28] It is clear to us, however, that the differentiation under the circumstances it occurred cannot be made a reason for reversing the Commission's order in these cases. The Commission's explanation is this. The Gulf increase rate would produce an estimated $238 per year total. The approval was routine. As soon as the Gulf approval was brought to the Commission's attention, the Commission instituted an investigation which it consolidated with petitioners' proceeding. This so-called discrimination is not the type that requires like handling of other similar applications for rate increases. A motion to correct the Gulf order would be adequate. Cf. American Trucking Ass'n v. Frisco Transp. Co., 358 U.S. 133, 140, 79 S.Ct. 170, 3 L.Ed.2d 172.

■ *Fifth.* Finally we consider a motion filed in case No. 14581 by the respondent, the Commission, to dismiss all petitioners except Pan American Petroleum Corporation for want of jurisdiction in this court to consider the petition for review as to them because these petitioners had not been parties to the Commission proceedings. Court review of Com-

---

App.D.C. 260, 230 F.2d 810, 818; Union Oil Co. of California, 16 F.P.C. 100, 108-110.

**28.** Cf. Atlantic Seaboard Corp. v. Federal Power Comm., 4 Cir., 201 F.2d 568, 570.

mission orders is governed by § 19 of the Act.[29]

This proceeding was started by the application of Stanolind, now Pan American, for the change in the rate schedule discussed above. The record shows that the letter of transmittal was headed as follows:

"Change in Rate Schedule (Docket No. G–4452) of Stanolind Oil and Gas Company et al for sale of Natural Gas as an Independent Producer under Section 4 of the Natural Gas Act, in accordance with Federal Power Commission Order No. 174–B, issued December 17, 1954 (Stanolind No. 19,446)."

The first paragraph read:

"1. Pursuant to the requirements of Part 154 of Subchapter E, Regulations under the Natural Gas Act, Chapter I of Title 18, Code of Federal Regulations, as amended by Federal Power Commission Order No. 174–B, issued December 17, 1954, under Docket No. R–138, and particularly pursuant to Section 154.94 of said Regulations, the undersigned, Stanolind Oil and Gas Company, individually, and as operator of the jointly-owned properties involved herein, hereby gives notice to the Federal Power Commission and to the public of a change in the rates and charges presently in effect with respect to the sale of natural gas to the purchaser listed in Exhibit 'B', attached hereto. * * * "

So far as pertinent, the eighth and ninth paragraphs read:

"8. This change in rate schedule not only relates to Stanolind Oil and Gas Company's interest in the gas covered by said gas sales contract, but said change in rate schedule is also being filed for the benefit and in behalf of all nonoperators whose respective shares of the gas produced from jointly-owned properties operated by Stanolind have been sold under the contract referred to herein by Stanolind, as their agent, because of their failure to dispose of the same, to the extent that such nonoperators elect in writing to concur herein or to adopt this filing of a change in rate schedule as their own.

"9. Pursuant to the provisions of Clause (1) of Paragraph (b) of Sec. 154.91 of Order 174–B, this change in rate schedule is also being filed by Stanolind, as operator of the jointly-owned properties covered by said rate schedule, for and on behalf of all nonoperators owning interests in said properties. Attached hereto as Exhibit 'D' is a list of (a) all persons having working interests involved in the sale of natural gas covered by this filing, (b) the parties to the operating agreements covering the respective jointly-owned properties and (c) a statement of the respective interests of such parties in said properties. To the extent that any of said persons or parties has heretofore filed or hereafter files for itself with respect to the change in rate covered hereby, then this filing shall not apply to it or to its interests in the gas produced

29. 15 U.S.C. § 717r, 15 U.S.C.A. § 717r. Rehearings; court review of orders

"(a) Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. * * * No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made ap-

plication to the Commission for a rehearing thereon. * * *

"(b) Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the circuit court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, * * *."

from said jointly-owned properties. * * * "

Apparently there was an operating agreement for the various units that have been formed for selling gas under which the operator, Pan American, sells the gas of the units and attends to the management of the contract.

The record shows the method of selling generally:

"Q. What about that? Who were you negotiating for? A. For Stanolind.

"Q. The contract you were attempting to draw was for Stanolind only? What about Continental? A. Continental was in on the negotiations for themselves.

"Q. As to the other persons in the field, you were not at that time acting for them. Is that right? A. In a manner of speaking we were. Naturally as operators of the properties, it was our responsibility to make as good arrangements as possible for the disposition of the production.

"Q. Then the operating agreement in the field had been entered into prior to these negotiations or during the course of them? A. There were operating agreements. There is an operating agreement on each unit. Some of those were in effect at the time." R. 73.

"Q. You stated a while ago there is an operating agreement for each of the various units in the field. Is that correct? A. Yes, sir.

"Q. Under those operating agreements, does Stanolind, if it is the operator, have the right to sell anybody's gas except Stanolind's? A. Only for a period up to and not in excess of one year, and only in the absence of their election to take it themselves." R. 120.

■ All the petitioners here were specifically named in the application for rehearing. The application opened, "On behalf of the Episcopal Theological Seminary," then following other named parties, "comes now Pan American Petroleum Corporation (Pan American), by its attorneys, and pursuant to Section 19(a) of the Natural Gas Act, files this Application for Rehearing." No one under § 19 could file an application for rehearing unless they were a party. No one except Pan American had been a party to the original hearing. Therefore, the inclusion of their names in the application for rehearing was merely descriptive. We do not think that under § 19 any gas producer selling under the Pan American contract could be a petitioner on appeal who had not been a party in the proceeding before the Commission prior to the order refusing the escalation. Cf. Federal Power Comm. v. Colorado Interstate Gas Co., 348 U.S. 492, 497, 75 S.Ct. 467, 99 L.Ed. 583; Sun Oil Co. v. Federal Power Comm., 5 Cir., 256 F.2d 233, 239.

The practical necessity for allowing the operator to represent the many producers who make up the supply for the sale to the pipe lines led the Commission to adopt October 4, 1956, regulations since the beginning of these proceedings.[30] This section allows the operator who sells for producers to make the rate schedule filings and changes. As we think the petitioners whom the respondent seeks to strike were not parties to these proceedings before the Commission, we need not determine the effect of this October 4, 1956, amendment.

What we do determine on this motion to strike is that none of the petitioners except Pan American was a party to the Commission proceeding or was entitled to appeal under the provisions of Section 19 of the Natural Gas Act.

It follows that the motion to dismiss all petitioners except Pan American Petroleum Corporation for lack of jurisdiction in this court is sustained.

It further follows that the order of the Federal Power Commission of April 14, 1958, should be affirmed.

It is so ordered.

30. 18 CFR 154.91.