**MCI TELECOMMUNICATIONS CORPORATION, Petitioner,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondent,**

**American Telephone & Telegraph Company, The Bell Operating Companies, Mountain States Telephone & Telegraph Co., et al., Intervenors.**

**No. 85–1461.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1986.

Decided June 26, 1987.

William J. Byrnes, with whom Michael H. Bader, Kenneth A. Cox, Theodore D. Kramer, and John M. Scorce, Washington, D.C., were on the brief, for petitioner. Thomas R. Gibbon, Washington, D.C., entered an appearance.

John E. Ingle, Deputy Associate General Counsel, F.C.C., with whom Jack D. Smith, General Counsel, Daniel M. Armstrong, Association General Counsel, Nancy E. Stanley, Asst. General Counsel, F.C.C., Robert B. Nicholson, and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Linda Oliver, Atty., F.C.C., Washington, D.C., entered an appearance.

Jules M. Perlberg, Chicago, Ill., with whom David J. Lewis, Washington, D.C., Judith A. Maynes and Robert B. Stechert, Basking Ridge, N.J., were on the brief, for intervenor, AT & T. Michael Berg entered an appearance.

Raymond F. Scully, Alan B. Sternstein and Louise L. M. Tucker, Washington, D.C., entered appearances, for intervenor, The Bell Operating Companies.

Robert B. McKenna, Washington, D.C., entered an appearance, for intervenors, Mountain States Tel. & Tel. Co., et al.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and GESELL,* District Judge.

MIKVA, Circuit Judge:

Petitioner, MCI Telecommunications Corporation (MCI), seeks review of an order entered by the Federal Communications Commission (the Commission or the FCC). The order allowed American Telephone and Telegraph Company (AT & T) to implement proposed revisions to its interstate private-line tariffs. These revisions established "Project Liability" charges for a customer's cancellation or discontinuance of large service orders. In allowing the new charges to become effective, the Commission determined that the proposed Project Liability tariff revisions were not barred by a settlement agreement entered into by AT & T and a number of competing common carriers, including MCI. We find that the Commission's determination was reasonable, and we deny the petition for review.

## I. Background

At issue in this case is the Commission's interpretation of the 1975 settlement agreement in FCC Docket No. 20099 (the Agreement), which governs the terms on which AT & T provides interconnection services to its competitors. This is the fourth time that this court has reviewed decisions of the Commission interpreting the Agreement in light of proposals by AT & T to revise the rates established in the Agreement. *See Western Union Telegraph Co. v. FCC,* 815 F.2d 1495 (D.C.Cir.1987); *RCA Global Communications, Inc. v. FCC,* 717 F.2d 1429 (D.C.Cir.1983); *MCI Telecommunications Corp. v. FCC,* 665 F.2d 1300 (D.C.Cir.1981).

The FCC initiated Docket No. 20099 in 1974 to investigate the tariffs under which AT & T and 19 Bell System Operating Companies (BSOCs) offered facilities to other common carriers (OCCs). Under the tariffs, AT & T provided the OCCs with interstate connection facilities and the BSOCs offered the OCCs intrastate distribution facilities. At the time, the rates AT & T and the BSOCs charged the OCCs for use of these facilities and the terms on which they offered the service were the subject of considerable controversy. Shortly before the formal investigation began, AT & T and the BSOCs asked the Commission for an opportunity to resolve the controversy by negotiation. The FCC authorized and oversaw negotiations, as a result of which AT & T, the BSOCs, and the OCCs reached a compromise agreement. The Agreement specifies the interconnection facilities and services AT & T and the BSOCs will offer to the OCCs, the rates the carriers will charge, and the conditions under which these terms can be changed. In 1975, the Commission accepted the Agreement, without expressing approval, as a settlement of Docket No. 20099 without prejudice. *See American Tel. & Tel. Co., Offer of Facilities for Use by Other Common Carriers,* 52 F.C.C.2d 727 (1975). The Commission retained the authority to monitor the Agreement's implementation and to resolve any problems that might arise. *See id.* at 733.

Most of the detailed provisions of the Agreement are contained in five appendices. Of particular relevance to this case is Appendix B. This appendix contains the text of AT & T Tariff No. 266, which governs the OCCs' use of AT & T's interstate private-line facilities (which the OCCs use primarily to establish connections between exchanges where they lack their own facilities). "Private-line" services are furnished on a dedicated basis to customers with large-volume communications requirements. The rates in Tariff No. 266 are established by cross-reference to Tariff No. 260, under which AT & T offers similar

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

services to the general public as end-users. Thus, instead of containing a specific rate schedule of its own, Tariff No. 266 states that the rates under the tariff "are the same as those listed" in AT & T Tariff No. 260, "including any revisions to such rates which may be made from time to time." *Id.* at 794. Tariff No. 260, however, is explicitly outside the bounds of the Agreement. *See id.* at 742. In other words, the Agreement does not govern or limit future revisions to the public tariff.

The Agreement also prescribes the manner in which the rates established thereunder can be changed. The Agreement states that "[t]he Bell System companies will not ... make revisions to the OCC facility tariffs which are inconsistent with the [Agreement]." *Id.* at 741. Pursuant to the Agreement, the interstate rates charged in Tariff No. 266 can be changed at any time, without satisfying procedural preconditions or filing supporting cost data; AT & T need only revise the public tariff rates, which would automatically change the rates in Tariff No. 266 by virtue of its cross-referencing to Tariff No. 260. *See RCA Gloval Communications,* 717 F.2d at 1436.

The AT & T Project Liability revisions at issue here applied to both Tariff No. 260, the public private-line tariff, and Tariff No. 266, the OCC private-line tariff. Through the revisions, AT & T sought to establish liability charges for the cancellation or discontinuance of orders which were part of a defined "project"—nine or more voice grade private-line circuits between a given pair of rate centers with scheduled service dates within the same calendar month. AT & T sought the revisions to combat over-ordering by private-line customers, which AT & T contended had become common, particularly among certain OCCs. According to AT & T, project-linked liability was necessary to deter speculative ordering and to recover some of the costs allegedly incurred when large orders were cancelled shortly before the scheduled service commencement date or discontinued shortly thereafter. The public and OCC tariffs were each amended to specify the conditions under which the Project Liability charges would be assessed. AT & T set out the relevant conditions in Tariff No. 266 by adding a new section to the "Regulations" part of the tariff. The specific rate levels were set forth only in Tariff 260; AT & T added the new rates to the pre-existing section 3.2.2(C) of the public tariff. These rates were incorporated by reference in the "Rates and Charges" part of Tariff No. 266 in two ways. First, the existing version of section 4.2.1 of the OCC tariff, which established "facility rates," already referred to and incorporated section 3.2.2(C) of Tariff No. 260. The Project Liability charges were therefore automatically incorporated into Tariff No. 266. Second, AT & T added a new section to the tariff's rate schedule. This new section specifically identified the Project Liability charges as consisting of "the applicable cancellation charge ... found in Tariff FCC No. 260, Section 3.2.2(C)(7)(a)" and the discontinuance charge set forth in section 3.2.2(C)(7)(b) of Tariff No. 260. *See AT & T Transmittal No. 191,* 6th Revised Page 23.1.

MCI and other customers of AT & T's private line service filed petitions to reject or to suspend and investigate the proposed Project Liability tariff revisions. MCI advanced several arguments, including that the revisions directly conflicted with the terms of the Agreement. The Chief of the Common Carrier Bureau denied the petitions to reject or suspend and allowed the proposed Project Liability charges to become effective. *See AT & T Communications* (Transmittal Nos. 191 and 233), released Jan. 3, 1985 (Mimeo No. 1613). The Bureau Chief specifically found that AT & T's proposal did not violate the Agreement.

> The Project Liability proposal does not violate the Settlement Agreement in Docket No. 20099. The Commission has previously recognized that when rates change for OCCs as a result of cross-reference to AT & T No. 260 rates, the Settlement Agreement does not bar those rate changes.

*Id.* at 7 n. 14.

MCI filed an application for Commission review of the Bureau order, raising the

single issue of whether the Project Liability tariff revisions violate the Agreement. MCI contended that the revisions were inconsistent with the terms and conditions of the original version of Tariff No. 266 (i.e., that version set out in Appendix B of the Agreement). The revisions, MCI therefore concluded, were barred by the *Sierra-Mobile* doctrine, which prohibits a federal agency from permitting the unilateral abrogation of a private inter-carrier contract thorugh tariff revisions. *See FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Mobile Gas Service Co.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). Specifically, MCI argued that the only rates that could be changed automatically through cross-referencing to Tariff No. 260 were those rates originally listed in the "facility rates" section of the Appendix B version of Tariff No. 266. And given that "cancellation" and "discontinuance" charges did not appear in that section, those charges could not be changed (or added) through cross-reference. Moreover, MCI asserted that the Project Liability revisions in any event were not "rate" changes, but rather "regulation" changes, which MCI contends the Agreement bars.

In a Memorandum Opinion and Order, the Commission denied MCI's petition for review. *See AT & T Communications, Inc.* (Transmittal Nos. 191 and 233), FCC 85–350, released July 16, 1985. The Commission first observed that the Agreement on its face does not limit AT & T's freedom to make rate changes to Tariff No. 260 and provides expressly that such changes would be incorporated by reference into Tariff No. 266. The FCC ruled that the Agreement does not limit the kinds of rate changes that can be made through cross-referencing. The Commission noted that since the adoption of the Agreement, many new charges have been added to Tariff No. 266 through this mechanism. The purpose of establishing rates by incorporation, the Commission said, was to help eliminate the disparities between AT & T's treatment of the public under Tariff No. 260 and its treatment of the OCCs under Tariff No. 266. The agency therefore found that the equivalent application of the Project Liability charges to customers under both tariffs, as proposed by AT & T, was consistent with the purpose and spirit of the Agreement. The Commission concluded that there was "no basis for acceding to MCI's request to ... read into the Settlement Agreement limitations not provided in the original document." *Id.* at 4.

In its petition for review, MCI raises the same objections that it voiced before the Commission. AT & T seeks to protect the decision in its favor by intervening on the Commission's behalf.

## II. Discussion

█ MCI contends that the AT & T Product Liability tariff filings were in derogation of AT & T's contractual obligations in the Agreement—namely, AT & T's agreement not to change the OCC facility tariffs in a manner inconsistent with the Agreement. MCI contends that the Project Liability tariff revisions contravene the manner in which the Agreement permits AT & T to make changes to Tariff No. 266. If AT & T's revisions abrogate the Agreement, as MCI alleges, then the FCC's decision to permit the proposals to become effective violates the *Sierra-Mobile* doctrine. The *Sierra-Mobile* principles apply with equal force when a party unilaterally abrogates a contractual agreement to a rate changeable in a specific manner as when a party abrogates an agreement to a specific rate. *See MCI Telecommunications*, 665 F.2d at 1302.

█ The dispute in this case boils down to a matter of contract interpretation: does the Agreement preclude the incorporation of AT & T's Project Liability tariff charges into Tariff No. 266? This circuit has held that a reviewing court generally must defer to an agency's interpretation of a settlement agreement concerning matters within the agency's statutory field of administration. *See National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569–73 (D.C.Cir.1987). The settlement agreement at issue here stemmed from and was designed to resolve an ongoing proceeding

before the Commission; the Commission authorized the negotiation of the Agreement; the parties conducted all but a handful of the negotiations on the agency's premises and in the presence of agency personnel, although the Commission itself is not a party to the Agreement; and the FCC accepted the Agreement as a settlement of its investigation and maintained supervisory control over the Agreement's implementation. Moreover, the contract provisions at issue require interpretation of intrinsically regulatory terms, and the Commission frequently employs its expertise in reviewing the kinds of rates and regulations in question. In these circumstances, we are obliged to defer to the agency's interpretation of the Agreement. *See Western Union Telegraph Co.*, at 1502. Under such a deferential standard of review, we must accept the Commission's understanding of the terms of the Agreement unless it is unreasonable. Thus, the sole question for this court is whether the Commission's determination that the Agreement permitted AT & T to incorporate the Project Liability charges into Tariff No. 266 through cross-reference to Tariff No. 260 was reasonable.

We conclude that the agency's determination was reasonable. Section 4.2.1 of the Appendix B version of Tariff No. 266 provided that rates for OCC facilities would be "the same" as the rates listed in public Tariff No. 260 and that changes to Tariff No. 260 rates made "from time to time" would automatically change the comparable Tariff No. 266 rates. Among the seven categories of facilities originally offered under Tariff No. 266 were "voice grade" and "voice grade connecting" facilities. The parties originally agreed that the OCC rates for these services would track the section 3.2.2(C) Tariff No. 260 rates for similar services, including any revisions. Because changes in Tariff No. 260 rates could be made at any time, changes in the Tariff No. 266 rates for these services could essentially be made at any time. The AT & T Project Liability charges utilized this rate-referencing mechanism. The revisions changed the rates for voice grade service by increasing the charges for customers who cancelled large service orders and by adding a discrete, unbundled charge for customers who placed large orders and either cancelled their orders shortly before the scheduled effective date or discontinued service prematurely. AT & T set out these newly unbundled cancellation and discontinuance charges in section 3.2.2(C) of public Tariff No. 260. Section 3.2.2(C) was one of the sections of Tariff No. 260 that had originally been specifically cross-referenced in Tariff No. 266. AT & T also incorporated the new charges into Tariff No. 266, in a more detailed fashion, by adding a new section to the "Rates and Charges" portion of the schedule, and by changing the "Regulations" part of the tariff to reflect the conditions under which the new charges would be assessed. In sum, the Project Liability revisions increased the public rates for voice grade service, cross-referenced these increases to the tariff applicable to OCCs, and did so in a way anticipated by section 4.2.1 of the Appendix B version of Tariff No. 266. The revisions therefore were consistent with the Agreement.

MCI's opposition to the Commission's decision is not based on a disagreement with the FCC as to the basic structure of the Agreement. Instead, MCI disagrees as to the extent to which revisions in the public tariff rates may be incorporated by reference into the OCC tariff. MCI's primary argument is that the only revisions filed in Tariff No. 260 that may be incorporated by reference into Tariff No. 266 are revisions to those rates that were specifically cross-referenced in the Appendix B version of Tariff No. 266. Other revisions to the public tariff rates, MCI asserts, cannot be included in the OCC tariff pursuant to the Agreement. Because cancellation and discontinuance charges were not listed among the originally cross-referenced facility rates, MCI contends that the Agreement precludes AT & T's subsequent attempt to add these charges to Tariff No. 266 and to cross-reference them to Tariff No. 260.

The plain language of the Agreement does not support MCI's reading. The tar-

iff's basic rate-referencing provision (section 4.2.1) speaks in general terms:

> The rates for facilities provided under this tariff, are the same as those listed in the [AT & T] Tariff FCC No. 260, including any revisions to such rates which may be made from time to time, as follows ...

52 FCC2d at 794. The subparagraphs that follow identify kinds of facilities to which the tariff applies. They neither refer to nor limit the types of rates that may be imposed with regard to those facilities. MCI's contention that the term "revision" refers only to a modification of the specifically cross-referenced Tariff No. 260 rates mentioned in the original subparagraphs is insupportable. Section 4.2.1 of Tariff No. 266 does not limit the types of facility rates which can be changed through cross-reference. Nor does the Agreement preclude additional facility rate-referencing beyond that which was initially specified in the Appendix B version of Tariff No. 266. The Agreement does not bar AT & T from referencing public tariff facility charges that were not contemplated in the original version of the OCC tariff.

MCI also argues that, in any event, the Product Liability charges are not "rates" as contemplated by Tariff No. 266 and are not subject to the cross-referencing provisions of the Agreement. According to MCI, cancellation and discontinuance charges have always been treated as "regulations." In support of this view, MCI points to section 2.4.3 of the "Regulations" portion of the tariff which contains cancellation penalty provisions. These provisions do not cross-reference the public tariff and therefore cannot be changed through incorporation of revisions made to Tariff No. 260.

We cannot gainsay the Commission's determination that the Project Liability cancellation and discontinuance charges are part of the "rates" established for voice grade facilities under the terms of the Agreement. A "rate" is a charge to a customer to receive service. *See generally* Black's Law Dictionary 1134 (5th ed. 1979). Public utility rates are a means by which the carrier recovers its costs of service from its customers. Part of AT & T's cost of providing private-line service is the cost incurred from last-minute cancellation of orders and early termination of service. These acts result in customers' not paying rates sufficient to cover the cost of filling the orders and often subject AT & T to additional costs while facilities lie idle. In the past, AT & T recovered these costs by raising its general rates for private-line service, thereby spreading the costs among all ratepayers. The Project Liability charges are designed to unbundle these discrete costs and impose them directly on the customers who caused AT & T to incur the costs. This adjustment in billing does not mean that these cost items are not part of the charge to the customer to receive interconnection service. We therefore conclude that the Commission reasonably found that the Project Liability charges are "rates" within the meaning of the Agreement.

Finally, MCI argues that even assuming that the Project Liability charges are "rate" revisions and that Tariff No. 266 permits the addition of new rates by cross-reference to the public tariff, the Agreement precludes the addition of charges relating to subject matter already addressed in an entirely different provision of Tariff No. 266. That is, MCI contends that the Agreement forbids AT & T to revise its rates through the cross-referencing mechanism if the revision would affect a non-"rate" provision of the Agreement. As noted earlier, MCI asserts that the charges at issue here—cancellation and discontinuance—are the subject of section 2 of the "Regulations" part of Tariff No. 266. The section 2 regulations set out certain circumstances in which an OCC is liable for cancellation penalties and define how these charges are to be calculated. MCI avers that the Project Liability revisions drastically alter these agreed-upon regulations and add charges where none existed before. Thus, according to MCI, the Agreement prohibits the incorporation of the Product Liability charges into the facility rates section of Tariff No. 266.

The issue presented by MCI's argument is whether the Agreement proscribes AT & T's use of the rate change provisions of section 4 of Tariff No. 266 to make rate changes that also affect the cancellation penalty regulations in section 2 of the tariff. The Commission never directly addressed this aspect of MCI's challenge. Nevertheless, we uphold the agency's implicit rejection of the argument. The parties to the contract agreed that the tariff provisions set out in the Agreement would not be changed except in limited, enumerated ways. One such exception is in the case of "tariff rate revisions which may be filed in AT & T Tariff F.C.C. No. 260 and incorporated by reference into AT & T Tariff F.C.C. No. 266." 52 F.C.C.2d at 738 n. 2. Given the substantial deference due the agency's interpretation of the terms of the Agreement, we are unwilling to disturb the Commission's determination that these words mean exactly what they say: Tariff No. 266 may be unilaterally changed by the established rate-referencing mechanism. The Agreement contains no proviso that this mechanism may not be used to revise rates if such a revision would alter, to some extent, provisions in addition to those governing the rates themselves. MCI seeks to impose a limitation where the language of the Agreement itself imposes none. Nothing in the Agreement compels the conclusion that otherwise permissible Tariff No. 266 rate revisions may not be implemented if they affect other provisions of the tariff. We therefore uphold the Commission's reading of the Agreement as allowing AT & T to make changes to the facility rates charged to OCCs under Tariff No. 266 by cross-referencing to Tariff No. 260's Project Liability charges, even though the changes may alter, to some extent, the cancellation penalty provisions contained in the OCC tariff regulations.

In sum, nothing in the Agreement precludes AT & T's attempt to identify the different cost components of a facility rate and assign them to OCC customers that are responsible for them by cross-referencing to the rate schedule in the public tariff. Because the contract itself does not restrict AT & T's efforts to change OCC tariff rates in this way, there can be no violation of the *Sierra-Mobile* doctrine. That doctrine bars agencies from giving effect to unilateral tariff revisions that violate intercarrier contracts. If the contract does not limit the utility's ordinarily unfettered right to petition for a tariff revision, as we have concluded it does not here, then there is no abrogation to challenge and *Sierra-Mobile* has no applicability. Accordingly, the Commission could properly permit the Project Liability tariff revisions to become effective.

## Conclusion

For the reasons set forth above, the FCC order at issue in this case is affirmed and the petition for review is denied.

*It is so ordered.*