## UNITED GAS PIPE LINE CO. *v.* MOBILE GAS SERVICE CORP. ET AL.

NO. 17.

Argued November 7–8, 1955.—Decided February 27, 1956.

*Thomas Fletcher* argued the cause for petitioner in No. 17. With him on the brief was *C. Huffman Lewis.*

*Howard E. Wahrenbrock* argued the cause for the Federal Power Commission, petitioner in No. 31 and respondent in No. 17. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Burger, Acting Assistant Attorney General Leonard, Melvin Richter, Lionel Kestenbaum, Willard W. Gatchell, William J. Grove, Louis C. Kaplan* and *Drexel D. Journey.*

*William C. Chanler* argued the cause for the Mobile Gas Service Corporation, respondent. With him on the brief was *Samuel M. Johnston.*

*Troy Smith, Thomas B. Ramey* and *Bryce Rea, Jr.* filed a brief for the City of Tyler, Texas, et al., as *amici curiae,* in support of the Mobile Gas Service Corporation.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question presented in this case is whether under the Natural Gas Act, 52 Stat. 821, 15 U. S. C. § 717 *et seq.,* a regulated natural gas company furnishing gas

to a distributing company under a long-term contract may, without the consent of the distributing company, change the rate specified in the contract simply by filing a new rate schedule with the Federal Power Commission. The pertinent provisions of the Act are set forth in the margin.[1]

---

[1] "SEC. 4. . . . (c) Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from the date this Act takes effect [June 21, 1938]) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

"(d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

"(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, or State commission, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such

Respondent Mobile Gas Service Corporation (Mobile), a distributor of natural gas to domestic and industrial users in Mobile, Alabama, acquires its gas from petitioner United Gas Pipe Line Company (United), a "natural-gas

schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect: *Provided,* That the Commission shall not have authority to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible." 52 Stat. 822–823, 15 U. S. C. § 717c.

"SEC. 5. (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reason-

company" subject to regulation under the Act. In 1946 the Ideal Cement Company (Ideal), planning to construct a cement plant in the city provided it could be assured a supply of gas at a sufficiently low rate, obtained from Mobile an agreement to furnish gas for a 10-year term at 12 cents per MCF (thousand cubic feet). Mobile, in turn, before entering into a contract with Ideal, obtained from United a 10-year contract to supply gas for resale to Ideal at the equivalent of 10.7 cents per MCF, a rate substantially lower than that for other gas furnished by United. This contract was filed with the Federal Power Commission as an amendment to the general supply contracts between Mobile and United, and, with the approval of the Commission, became a part of United's filed schedules of rates and contracts.

In June 1953 United, without the consent of Mobile, filed new schedules with the Commission which purported to increase the rate on gas for resale to Ideal to 14.5 cents per MCF, a rate more closely approximating that for other gas furnished to Mobile by United. Claiming that United could not thus unilaterally change the contract rate, Mobile petitioned the Commission to reject United's filing. The Commission denied the petition, holding that under § 4 (d) of the Act the new rate, being a non-suspendible industrial rate, automatically became effective 30 days after filing and would remain in effect unless and until the Commission should, after investigation

---

able rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates." 52 Stat. 823–824, 15 U. S. C. § 717d.

under § 4 (e), determine the new rate to be unlawful. Mobile paid the new rate until April 15, 1955, when United, with Commission approval, accepted an assignment to it of Mobile's contract with Ideal.[2] This assignment made the pending investigation into the lawfulness of the new rate moot, since in the Commission's view its determination on that matter would have no retroactive effect. Thus the only question before us is whether United properly collected from Mobile the difference between the old 10.7-cent rate and the new 14.5-cent rate during the period from July 25, 1953 (when the new rate purportedly went into effect), to April 15, 1955 (when United took over the Ideal contract)—a sum aggregating approximately $240,000. On Mobile's petition for review, the Court of Appeals for the Third Circuit (Hastie, J., dissenting) reversed the Commission's order, directed it to reject United's filing of the new schedule insofar as it purported to increase the rate in question, and held Mobile entitled to a return of the amounts paid in excess of the contract rate. 215 F. 2d 883. Both the Commission and United, which had intervened in the Court of Appeals, petitioned for certiorari, which we granted because of the importance of this question in the administration of the Natural Gas Act. 348 U. S. 950. For the reasons discussed below, we hold that the Natural Gas Act does not give natural gas companies the right to change their rate contracts by their own unilateral action.

The question presented is solely one of the proper interpretation of the Natural Gas Act, there being no claim that the statute, if interpreted to permit a natural gas company unilaterally to change its contracts, would be

---

[2] United agreed to pay Mobile 2 cents per MCF for transporting the gas to Ideal. Since under the assigned contract United received only 12 cents per MCF from Ideal, its net return after the assignment was only 10 cents per MCF, less than the 10.7 cents it had received under its earlier contract with Mobile.

unconstitutional. Cf. *Midland Realty Co.* v. *Kansas City P. & L. Co.,* 300 U. S. 109. The Act[3] requires natural gas companies to file all rates and contracts with the Commission (§ 4 (c)) and authorizes the Commission to modify any rate or contract which it determines to be "unjust, unreasonable, unduly discriminatory, or preferential" (§ 5 (a)). Changes in previously filed rates or contracts must be filed with the Commission at least 30 days before they are to go into effect (§ 4 (d)), and, except in the case of industrial rates, the Commission may suspend the operation of the new rate pending a determination of its reasonableness (§ 4 (e)). If a decision has not been reached before the period of suspension expires, a maximum of five months, the filed rate must be allowed to go into effect, but the Commission's order may be made retroactive to that date.

In construing the Act, we should bear in mind that it evinces no purpose to abrogate private rate contracts as such. To the contrary, by requiring contracts to be filed with the Commission, the Act expressly recognizes that rates to particular customers may be set by individual contracts. In this respect, the Act is in marked contrast to the Interstate Commerce Act, which in effect precludes private rate agreements by its requirement that the rates to all shippers be uniform, a requirement which made unnecessary any provision for filing contracts. See *Armour Packing Co.* v. *United States,* 209 U. S. 56. The Commission in its brief recognizes this basic difference between the two Acts and notes the differing natures of the industries which gave rise to it. The vast number of retail transactions of railroads made policing of individual transactions administratively impossible; effective regulation could be accomplished only by requiring compliance with a single schedule of rates applicable to all

---

[3] See note 1, pp. 334–336, *supra.*

shippers. On the other hand, only a relatively few whole-sale transactions are regulated by the Natural Gas Act and these typically require substantial investment in capacity and facilities for the service of a particular distributor. Recognizing the need these circumstances create for individualized arrangements between natural gas companies and distributors, the Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public.

The provision of the Natural Gas Act directly in issue here is § 4 (d), which provides that "no change shall be made by any natural-gas company in any such [filed] rate . . . or contract . . . except after thirty days' notice to the Commission," which notice is to be given by filing new schedules showing the changes and the time they are to go into effect. It is argued that this provision authorizes a natural gas company to change its rate contracts simply by filing a new schedule of rates, to go into effect in no less than thirty days. On its face, however, § 4 (d) is simply a prohibition, not a grant of power. It does not purport to say what is effective to change a contract, any more than § 4 (c) purports to define what constitutes a "contract" that may be filed with the Commission. The section says only that a change *cannot* be made without the proper notice to the Commission; it does not say under what circumstances a change *can* be made. Absent the Act, a unilateral announcement of a change to a contract would of course be a nullity, and we find no basis in the language of § 4 (d) for inferring that the mere imposition of a filing-and-notice requirement was intended to make effective action which would otherwise be of no effect at all. In short, § 4 (d) on its face indicates no more than that otherwise valid changes cannot be put into effect

without giving the required notice to the Commission. To find in the section a further purpose to empower natural gas companies to change their contracts unilaterally requires reading into it language that is neither there nor reasonably to be implied.

It is argued, however, that a different conclusion is compelled when § 4 (d) is read with the other provisions of the Act. Petitioners attempt to characterize the Act as setting up two separate and distinct "procedures" for changing rates: (1) the "hearing and order" procedure of § 5 (a) under which the Commission may determine *existing* rates to be unreasonable and order changes to be made; and (2) the "filed-rate" procedure of § 4 (d) and (e) under which the natural gas company may initiate changes, in which event the Commission's only concern is with the reasonableness of the *new* rate. These are said to be complementary and mutually exclusive procedures, the choice between which—since both expressly relate to changes in "contracts" as well as other rates—depends solely on who is seeking the change and not on whether the rate sought to be changed is embodied in a contract. From this characterization of the procedures, petitioners conclude that when a natural gas company initiates a rate change under § 4 (d) the proceedings are governed exclusively by § 4 (d) and (e), and hence the Commission's only power is that which it has under § 4 (e) to set aside the *new* rate if that is found to be unlawful.

The major defect of this argument is that it assumes the answer to the very question in issue—whether natural gas companies are empowered to "initiate" unilateral contract changes under § 4 (d). That the so-called "filed-rate" procedure is applicable to changes in contracts as well as other rates proves only that contracts may be changed, not that they may be changed unilaterally. Moreover, the very premise that §§ 4 (d) and (e) and 5 (a) are alternative rate-changing "procedures" is itself

based on a misconception of the structure of the Act. These sections are simply parts of a single statutory scheme under which all rates are established initially by the natural gas companies, by contract or otherwise, and all rates are subject to being modified by the Commission upon a finding that they are unlawful. The Act merely defines the review powers of the Commission and imposes such duties on natural gas companies as are necessary to effectuate those powers; it purports neither to grant nor to define the initial rate-setting powers of natural gas companies.

The powers of the Commission are defined by §§ 4 (e) and 5 (a). The basic power of the Commission is that given it by § 5 (a) to set aside and modify any rate or contract which it determines, after hearing, to be "unjust, unreasonable, unduly discriminatory, or preferential." This is neither a "rate-making" nor a "rate-changing" procedure. It is simply the power to review rates and contracts made in the first instance by natural gas companies and, if they are determined to be unlawful, to remedy them. Section 5 (a) would of its own force apply to *all* the rates of a natural gas company, whether long-established or newly changed, but in the latter case the power is further implemented by § 4 (e). All that § 4 (e) does, however, is to add to this basic power, in the case of a newly changed rate or contract (except "industrial" rates), the further powers (1) to preserve the status quo pending review of the new rate by suspending its operation for a limited period, and (2) thereafter to make its order retroactive, by means of the refund procedure, to the date the change became effective. The scope and purpose of the Commission's review remain the same— to determine whether the rate fixed by the natural gas company is lawful.

The limitations imposed on natural gas companies are set out in §§ 4 (c) and 4 (d). The basic duties are

the filing requirements: § 4 (c) requires schedules show-ing all rates and contracts in force to be filed with the Commission and § 4 (d) requires all changes in such schedules likewise to be filed. In addition, § 4 (d) im-poses the further requirement that the changes be filed at least thirty days before they are to go into effect. It may readily be seen that these requirements are no more than are necessary to implement §§ 4 (e) and 5 (a): the filing requirements are obviously necessary to permit the Commission to exercise its review functions, and the requirement of 30-days' advance notice of changes is essential to afford the Commission a reasonable period in which to determine whether to exercise its suspension powers under § 4 (e).

The relationship of these sections thus affords no sup-port to petitioners' characterization of § 4 (d) and (e) as establishing a rate-changing "procedure"—a "proceed-ing" before the Commission "initiated" by a natural gas company filing a "proposed" change. Section 4 (d) pro-vides not for the filing of "proposals" but for notice to the Commission of any "change . . . made by" a natu-ral gas company, and the change is effected, if at all, not by an order of the Commission but solely by virtue of the natural gas company's own action. If the purported change is one the natural gas company has the power to make, the "change" is completed upon compliance with the notice requirement and the new rate has the same force as any other rate—it can be set aside only upon being found unlawful by the Commission. It is thus no more a "proposed" rate than any other rate, all of which are equally subject to Commission review. Likewise, no "proceeding" is "initiated" by a § 4 (d) filing. A pro-ceeding to review the new rate may be initiated under § 4 (e), but, if so, it is initiated by the Commission in the same manner as a proceeding under § 5 (a) to review any other rate, that is, upon complaint or its own motion.

The only difference is the interim suspension power given by § 4 (e), but that in no way affects the character of the proceeding, which remains, like a § 5 (a) proceeding, simply a review by the Commission of a rate established by the natural gas company. In short, the Act provides no "procedure" either for making or changing rates; it provides only for *notice* to the Commission of the rates established by natural gas companies and for *review* by the Commission of those rates. The initial rate-making and rate-changing powers of natural gas companies remain undefined and unaffected by the Act.

All of the relevant provisions of the Act can thus be fully explained as simply defining and implementing the powers of the Commission to review rates set initially by natural gas companies, and there is nothing to indicate that they were intended to do more. Admittedly, the Act presumes a capacity in natural gas companies to make rates and contracts and to change them from time to time, but nowhere in the Act is either power defined. The obvious implication is that, except as specifically limited by the Act, the rate-making powers of natural gas companies were to be no different from those they would possess in the absence of the Act: to establish *ex parte,* and change at will, the rates offered to prospective customers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer. No more is necessary to give full meaning to all the provisions of the Act: consistent with this, § 4 (d) means simply that *no* change—neither a unilateral change to an *ex parte* rate nor an agreed-upon change to a contract—can be made by a natural gas company without the proper notice to the Commission. Hence there is nothing in the structure or purpose of the Act from which we can infer the right, not otherwise possessed and nowhere expressly given by the Act,

of natural gas companies unilaterally to change their contracts.

Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act. By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. Conversion by consumers, particularly industrial users, to the use of natural gas may frequently require substantial investments which the consumer would be unwilling to make without long-term commitments from the distributor, and the distributor can hardly make such commitments if its supply contracts are subject to unilateral change by the natural gas company whenever its interests so dictate. The history of the Ideal contract furnishes a case in point. On the other hand, denying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest. The Act thus affords a reasonable accommodation between the conflicting interests of contract stability on the one hand and public regulation on the other.

It may be noted also that this interpretation, while precluding natural gas companies from unilaterally changing their contracts simply because it is in their private interests to do so, does not deprive them of an avenue of relief when their interests coincide with the public interest. Section 5 (a) authorizes the Commission to investigate rates not only "upon complaint of any State, municipality, State commission, or gas distributing company" but also "upon its own motion." Thus, while natural gas companies are understandably not given the same explicit standing to complain of their own contracts

as are those who represent the public interest or those who might be discriminated against, there is nothing to prevent them from furnishing to the Commission any relevant information and requesting it to initiate an investigation on its own motion.[4]   And if the Commission, after hearing, determines the contract rate to be so low as to conflict with the public interest, it may under § 5 (a) authorize the natural gas company to file a schedule increasing the rate.

The prior decisions of this Court cited by petitioners as requiring an opposite result are readily distinguishable. In *Armour Packing Co.* v. *United States,* 209 U. S. 56, a rate contract between a railroad and a shipper at the filed rates in effect at the time the contract was made was held not to justify payment at the contract rate for shipments made after the filed rates for shipments of that character had been increased by the railroad.   The very basis for that decision, however, was the requirement of the Interstate Commerce Act that rates to all shippers be uniform and comply with the single tariff filed with the Commission, there being no provision under that Act for the filing of individual contracts.   That is, the Interstate Commerce Act by its own force precluded contracts for rates different from those applicable to other shippers.   The Natural Gas Act, on the other hand, recognizes the need for private contracts of varying terms and expressly provides for the filing of such contracts as a part of the rate schedules.   No contention is made here that the fact that the Mobile contract was at a rate different from that to other customers in itself made the contract illegal or that—as held in *Armour*—United could not lawfully have complied with the contract had it wanted to.   In *Midland*

---

[4] See § 14 (a) of the Act, providing in part: "The Commission may permit any person to file with it a statement in writing . . . as to any or all facts and circumstances concerning a matter which may be the subject of investigation."   52 Stat. 828, 15 U. S. C. § 717m.

*Realty Co.* v. *Kansas City P. & L. Co.,* 300 U. S. 109, the Court held only that a statute interpreted by the state court as authorizing unilateral contract changes by a public utility was not unconstitutional. On the other hand, in *Wichita Railroad & Light Co.* v. *Public Utilities Commission of Kansas,* 260 U. S. 48, this Court interpreted a Kansas statute, not yet fully construed by the state court, as not giving such a power to a public utility, and to the extent that that decision rested upon an original interpretation of similar statutory language it affords strong support for our interpretation of the Natural Gas Act.

The only two Courts of Appeals that have squarely ruled on this question, those for the District of Columbia and Third Circuits, have concluded that neither the Natural Gas Act,[5] nor the virtually identical provisions of the Federal Power Act [6] authorize unilateral contract changes.[7] The Court of Appeals for the Fifth Circuit, however, although distinguishing its decision on a procedural ground, has indicated a contrary conclusion.[8] The parties have also referred us to numerous state court decisions construing state statutes of varying degrees of similarity to the Natural Gas Act, some holding that unilateral contract changes were authorized [9] and others

---

[5] *Mobile Gas Service Corp.* v. *F. P. C.,* 215 F. 2d 883 (C. A. 3d Cir.), the decision below.

[6] *Sierra Pacific Power Co.* v. *F. P. C.,* 96 U. S. App. D. C. 140, 223 F. 2d 605, affirmed, *post,* p. 348.

[7] See also *Colorado Interstate Gas Co.* v. *F. P. C.,* 142 F. 2d 943, 954 (C. A. 10th Cir.), affirmed, 324 U. S. 581.

[8] *Tyler Gas Service Co.* v. *United Gas Pipe Line Co.,* 217 F. 2d 73.

[9] *E. g., City of Lamar* v. *Town of Wiley,* 80 Colo. 18, 248 P. 1009; *Kansas City L. & P. Co.* v. *Midland Realty Co.,* 338 Mo. 1141, 93 S. W. 2d 954, affirmed, 300 U. S. 109; *Suburban Water Co.* v. *Oakmont Borough,* 268 Pa. 243, 110 A. 778; *North Coast Power Co.* v. *Public Service Comm'n,* 114 Wash. 102, 194 P. 587.

holding that they were not.[10]  Taken as a whole, the state decisions prove little more than that the question is an open one and afford little guidance to the proper interpretation of the Federal Act.

From our conclusion that the Natural Gas Act gives a natural gas company no power to change its contracts unilaterally, it follows that the new schedule filed by United was a nullity insofar as it purported to change the rate set by its contract with Mobile and that the contract rate remained the only lawful rate.  There can be no doubt of the authority of the Commission to reject the unauthorized filing under its general powers to issue orders "necessary or appropriate to carry out the provisions of this Act," § 16, and its failure to do so and its order "permitting" the new rates to become effective were in error.  Any amounts paid by Mobile in excess of the contract rates on the basis of the erroneous order of the Commission were therefore unlawfully collected, and United is obligated to make restitution of the excess payments.  Cf. *Baltimore & Ohio R. Co.* v. *United States,* 279 U. S. 781.

*Affirmed.*

---

[10] *E. g., Rutland R. L. & P. Co.* v. *Burditt Bros.,* 94 Vt. 421, 111 A. 582; *Commonwealth ex rel. Page Milling Co.* v. *Shenandoah River L. & P. Corp.,* 135 Va. 47, 68–73, 115 S. E. 695, 701–703; *In re Searsport Water Co.,* 118 Me. 382, 392–393, 108 A. 452, 457–458; see also *Attleboro Steam & Elec. Co.* v. *Narragansett Elec. Lighting Co.,* 295 F. 895 (D. R. I.).