21 F.3d 1130
 305 U.S.App.D.C. 382
 TOWN OF BOYLSTON, City of Holyoke, Town of Hudson, Littleton
Electric Light Department, Marblehead Municipal Light
Department, Middleborough Gas and Electric Department, Town
of North Attleboro, Peabody Municipal Light Plant, Westfield
Gas and Electric Light Department, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Boston Edison Company, Intervenor.
 No. 92-1261.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 13, 1993.
Decided April 22, 1994.
 
 Petition for Review of An Order of the Federal Energy Regulatory Commission.
 P. Daniel Bruner, Washington, DC, argued the cause for petitioners. With him on the briefs, were Frances E. Francis and Rise J. Peters, Washington, DC.
 Eric Christensen, Atty., F.E.R.C., Washington, DC, argued the cause for respondent. With him on the brief, were Susan Tomasky, Gen. Counsel, F.E.R.C., Jerome M. Feit, Sol., F.E.R.C., and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, DC.
 On the brief, for intervenor Boston Edison Co., was Carmen L. Gentile, Washington, DC.
 Before: WILLIAMS, SENTELLE and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Boston Edison Company has estimated that the decommissioning of its "Pilgrim 1" nuclear plant (operating under a license that will expire in 2008) will cost $121.9 million in 1985 dollars. Believing that current customers should meet this expense as they use the power, Boston Edison in 1986 filed rates with the Federal Energy Regulatory Commission to impose such a charge on 13 municipal purchasers (which FERC collectively calls the "Municipals"). See Federal Power Act Sec. 205, 16 U.S.C. Sec. 824d (1988). In the aggregate the Municipals held entitlements to about 3% of the power from Pilgrim; the remaining sales are evidently either non-jurisdictional or to customers that agreed to the charge. See Boston Edison Letter to FERC, August 8, 1986, at 4. In making the filing Boston Edison argued that the charge was authorized by its contracts with the Municipals (which are identical except as to identity of the purchaser and the percent of output purchased). The Commission agreed. Boston Edison Company, 52 FERC p 61,010 (1990) ("Opinion No. 350"); see also Boston Edison Company, 59 FERC p 61,062 (1992) ("Opinion No. 350-A") (denying Boston Edison's petition for rehearing). Because we find the Commission's reading of the contract unsustainable, even with the deference we owe its interpretation, see National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1569 (D.C.Cir.1987), we reverse and remand for further consideration.
 
 
 2
 * * * * * *
 
 
 3
 There is no dispute over whether the Municipals are ultimately liable for their share of decommissioning costs. Indeed, to support their view that the costs are payable to Boston Edison only when they are incurred, the Municipals rely in part on the section that establishes a right to reimbursement, Paragraph 7.0, entitled "Shutdown or Permanent Retirement ":
 
 
 4
 Buyer agrees to reimburse seller for [a specified percentage] of any dismantlement or removal costs or expenses incurred by Seller in the shutdown, or permanent retirement, or both, of the Unit, including but not limited to any cost of removal commenced within three years after the end of the term or the date of cancellation.
 
 
 5
 The Municipals suggest that the term "reimburse" and the use of the past tense--"incurred"--imply that the expenditure at issue will have already occurred.
 
 
 6
 The Commission, however, relied on the contract's provision for a monthly capacity charge, and, more particularly, on the paragraph explaining the computation of its depreciation component, Par. C-6.3.1:
 
 
 7
 Depreciation applicable to the facilities shall be computed on a straight line basis using Gross Investment and a service life of twenty-eight (28) years or until such time as the depreciation reserve equals the gross investment as defined below, at which time depreciation shall cease. For depreciation purposes, Gross Investment as defined in C-4.0 shall be adjusted to exclude associated land costs, nuclear fuel investment, prepaid and working capital items, materials and supplies. Plant retirements, both normal and extraordinary, including salvage values and cost of removal, shall also be reflected through this subparagraph in a manner consistent with the method of handling on the Seller's books of account.
 
 
 8
 (Emphasis added.) The Commission reads the last sentence to permit collection of estimated decommissioning costs on a current basis. In support of its reading, it makes two main arguments. First, this interpretation accords with the general ratemaking principle that costs should be "collected currently from the customers benefitting from the service provided by the facility." Opinion No. 350, 52 FERC at 61,075. Indeed, the Municipals themselves acknowledge the principle, though not the contractual obligation, arguing that it should be fulfilled by their paying estimated decommissioning costs on a current basis into a special trust fund, which would be better for them from a tax perspective than paying Boston Edison currently. See Boston Edison Company, 42 FERC p 63,033, 65,220, 65,223 (1988) ("Initial Decision").[1]
 
 
 9
 Second, the Commission offers an interpretation that, it says, embodies the contract principle of reconciling apparently contradictory clauses "by affording each provision the fullest meaning possible." Opinion No. 350, 52 FERC at 61,075. Specifically, FERC fits Par. 7.0 together with C-6.3.1 in the following way: While C-6.3.1 provides for periodic collection of estimated costs, Par. 7.0 serves a clean-up function,
 
 
 10
 imposing an obligation upon the Municipals, which continues after termination of service pursuant to the contract, to reimburse Boston Edison for their share of costs incurred in decommissioning the plant to the extent such costs have not been recovered during the period of operation of the plant.
 
 
 11
 Id. (emphasis added). In the absence of Par. 7.0, the Commission explains, "Boston Edison would not be able to recover such costs from purchasers who are no longer taking service at the time of plant retirement." Id.
 
 
 12
 The Municipals, however, claim that the contract's specific terms for calculating depreciation undercut the Commission's view. According to Par. C-6.3.1, when "the depreciation reserve [i.e., aggregate amount charged as depreciation] equals the gross investment as defined below, ... depreciation shall cease." If depreciation includes amounts for decommissioning, the Municipals argue, the depreciation reserve will reach the level of gross investment, and depreciation will therefore terminate, well before Boston Edison has fully recouped its original investment.
 
 
 13
 The force of the Municipals' argument would seem to turn on how gross investment is computed. If the decommissioning costs go into gross investment, then the argument disintegrates; the costs are on both sides of the process and exhaustion of depreciable gross investment occurs when it should, not prematurely.
 
 
 14
 At this point, rather than turning to the contract provisions on gross investment, the Commission took what to us is an incomprehensible leap. It declared that the last sentence of C-6.3.1, rather than authorizing an additional element of depreciation, "provide[d] for recovery of decommissioning expenses as a separate cost component of the formula rate." Opinion No. 350, 52 FERC at 61,076. This interpretation appeared to disregard the phrase in the last sentence of C-6.3.1 that requires that plant retirements, etc., "shall also be reflected through this subparagraph ". The Commission dealt with the phrase by saying it required only that decommissioning costs would be "recoverable as a discrete cost component through the monthly capacity charge". Opinion No. 350-A, 59 FERC at 61,259.
 
 
 15
 But the contract takes a fairly orderly outline form, with C-6.1 defining the annual capacity charge as the sum of two items, demand charges (covered in C-6.2 and its subparts) and investment expenses (covered in C-6.3 and its subparts). Evidently the Commission reads "subparagraph" in the depreciation clause, C-6.3.1, as referring to some much broader concept, perhaps the capacity charge that C-6.1 defines. The Commission never explains, and we cannot fathom, why the drafters would put decommissioning costs in "depreciation" for purposes of including them in the demand charge but not in depreciation for purposes of making the actual computation.
 
 
 16
 The Municipals offer their own affirmative interpretation of the final sentence of Par. C-6.3.1. Their argument is that it refers not to the recovery of estimated costs of final decommissioning, but to adjustments to depreciation to handle retirements of components of the plant occurring from time to time over the life of the transaction. Thus, as we understand their position, if a component is retired and removal cost exceeds salvage value, the company would reduce the depreciation reserve by the amount of the difference, i.e., it would create "room" for taking that much additional depreciation. See Joint Appendix 8-9; Electric Plant Instruction 10(B)(2), 10(C)(2), 10(F), 18 CFR Pt. 101.
 
 
 17
 The Municipals' theory appears to reconcile the last sentence of Par. C-6.3.1 with Par. 7.0. While C-6.3.1 refers to "plant retirements, both normal and extraordinary" and "salvage values ", all in the plural, Par. 7.0 uses the singular "Permanent Retirement" or "Shutdown". Further, C-6.3.1 uses words consistent with known quantities--"values" and "cost"--and makes no reference to estimates or projections, which must be used under the Commission's reading. Of course the Municipals' interpretation has the further advantages of giving a reasonable meaning to the phrase "through this subparagraph" and of not treating the decommissioning expense as half in and half out of "depreciation".
 
 
 18
 The Commission claims that the Municipals' reading assigns different meanings to "cost of removal" in Par. C-6.3.1 and the almost identical phrase ("removal costs") in Par. 7.0; in the first clause the interpretation excludes decommissioning costs, in the second it includes them. But Par. 7.0 is limited to the removal costs "incurred by Seller in the shutdown, or permanent retirement ... of the Unit"; it covers those costs, whatever they may be. By the same token, on the Municipals' view Par. C-6.3.1 speaks to retirements of less than the Unit, including whatever costs such smaller retirements may entail.
 
 
 19
 The Municipals also note that there are circumstances clearly contemplated by the contract in which the Municipals would not be liable for decommissioning costs. Petitioners' Brief at 28-29. Paragraph 8.2(b) states:
 
 
 20
 if the Unit is shut down or permanently retired for the purpose of replacement of it by a new Unit on the portion of the site occupied by said Unit, Buyer shall have no liability for the costs of such shutdown or permanent retirement, including removal costs, except as Buyer may participate in the costs of such new Unit.
 
 
 21
 The Municipals contend that such a contingent approach is "inconsistent with those decommissioning costs having already been advanced" to Boston Edison. Paragraph 8.2(b) may provide some help to the Municipals, but since Par. C-8.2 of the contract provides for refunds where actual costs differ from estimates, and this may well embrace the sort of correction the Municipals are concerned about, the help is mild.
 
 
 22
 We cannot affirm the Commission's current reading of the contract; it strains credulity to suppose that the drafters put decommissioning costs in the depreciation provision for one purpose but whisked them out for purposes of actually calculating depreciation. The deference owed the Commission does not require us to "accept an agency interpretation that black means white", National Fuel Gas Supply Corp., 811 F.2d at 1572 (quotations omitted), and this comes pretty close.
 
 
 23
 This is not, however, the end of the matter; there may be another way for the Commission to skin the cat. Boston Edison as Intervenor argues that Par. C-4.1.6 permits it to add estimated decommissioning costs to "gross investment", so that charging them as depreciation would not, as the Municipals argued, lead to Boston Edison's recovering less than its full investment. Brief of Intervenor 13 n. 1. The Administrative Law Judge explicitly rejected the possibility, see 42 FERC at 65,231-32 n. 2, but the Commission did not consider it, so that it would inappropriate for us to do so now. Cf. SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).
 
 
 24
 Further, assuming the contract does not authorize the charge, the Commission may be able to meet its burden under Sec. 206 of the Federal Power Act, 16 U.S.C. Sec. 824e (1988), of showing that the contract is unjust and unreasonable insofar as it fails to provide for advance payment. If so, the Commission may impose alternative provisions in the public interest. See FPC v. Sierra Pacific Power Co., 350 U.S. 348, 352-55, 76 S.Ct. 368, 371-73, 100 L.Ed. 388 (1956); United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 344-45, 76 S.Ct. 373, 380-81, 100 L.Ed. 373 (1956).
 
 
 25
 Accordingly, the case is remanded to the Commission for further proceedings consistent with this opinion.
 
 
 26
 So ordered.
 
 
 
 [1]
 See also Petitioners' Brief at 6. We guess that the Municipals' concession may arise out of anticipation that, if there is no form of advance payment, the Commission is highly likely to find the contract unjust and unreasonable under Federal Power Act Sec. 206, 16 U.S.C. Sec. 824e, so that their prospects are best if they embrace an alternative mode of fulfilling the principle. See id