**GLOBAL ACCESS LIMITED, Plaintiff,**

v.

**AT&T CORP., Defendant.**

**No. 94–2192–CIV.**

United States District Court,
S.D. Florida.

Aug. 18, 1997.

Frederic Garvett, Scott A. Silver and Tim D. Henkel, Coconut Grove, FL, for Plaintiff.

Todd Legon, Cohen & Legon, Miami, FL, James F. Bendernagel, Sidley & Austin, Washington, DC, for Defendant.

### *ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

MORENO, District Judge.

■ The various motions for summary judgment before the Court present an issue of first impression: whether, under Federal telecommunications law, a common carrier may unilaterally modify the terms of its agreement with a customer once that agreement has been filed as a Contract Tariff with the Federal Communications Commission. For the reasons stated in the opinion that follows, the Court concludes that the *Sierra–Mobile* doctrine controls this issue and prohibits such unilateral amendments. Accordingly, the Court finds that as a matter of law Defendant AT&T materially breached its contract with Plaintiff Global Access.

### *LEGAL STANDARD*

■ Summary judgment is authorized where there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position. A jury must be able reasonably to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### *BACKGROUND*

Defendant AT&T Corp. ("AT&T") is a provider of long distance telecommunications services and is a "common carrier" within the meaning of the Federal Communications Act of 1934. AT&T is a facilities-based carrier, that is, it owns the physical facilities by which it provides its services. In accordance with the Act, AT&T's services are provided to customers pursuant to tariffs which AT&T is required to file with the Federal Communications Commission (the "FCC").

Plaintiff Global Access Limited ("Global") is a start-up company engaged in the sale of travel card and other travel-related telecommunication services. It was founded in 1993 and has never been profitable.

■ Between the end of 1993 and March 1994, Global entered into negotiations with AT&T for a contract tariff to provide long distance service to Global. A contract tariff is a negotiated agreement between a carrier and customer to provide telecommunication services. Contract tariffs specifically incorporate the terms of applicable general tariffs already on file with the FCC, and are themselves filed with the FCC. Once a common carrier files a contract tariff, it is bound by the terms of that tariff in providing services to other similarly-situated customers.

Global represented that the long distance services purchased from AT&T were to be used as a component of Global's travel card business. AT&T alleges that at that time Global did not represent that it also intended

to act as a reseller of long distance communication service, that is, an entity that purchases long distance services in bulk and then resells them for a profit.

On or about April 13, 1994, Global and AT&T executed a Contract Tariff Order ("CT Order"). AT&T drafted all of its terms. That CT Order provided an illustrative contract tariff that the parties titled "GLOBACC." GLOBACC was listed as "Attachment A" to the CT Order. It incorporated by reference several general AT&T tariffs already on file with the FCC. The CT Order stated that AT&T was to file with the FCC a contract tariff consistent with GLOBACC. Paragraph 10 of the CT Order further stated:

THIS AGREEMENT, THE CT, AND THE APPLICABLE TARIFFS CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SERVICE TO BE PROVIDED HEREUNDER. THIS AGREEMENT SUPERSEDES ALL PRIOR AGREEMENTS, PROPOSALS, REPRESENTATIONS, STATEMENTS, OR UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, CONCERNING SUCH SERVICES OR THE RIGHTS AND OBLIGATIONS RELATED THERETO. No change modification or waiver of any terms of this Agreement, except for the tariffs cited in Attachment A, shall be binding unless reduced to writing and signed by both parties.

On April 19, 1994, AT&T filed with the FCC Global's Contract Tariff as "CT 1119." CT 1119, as originally filed, was identical to GLOBACC in all respects. CT 1119 was to become effective on May 3, 1994.

Global alleges that in late April, AT&T learned that Global had intentions to resell its telecommunications services and concluded that it had given Global too good a deal under CT 1119. At least one other customer began requesting the same terms and rates as provided to Global under CT 1119. In correspondence between AT&T and Transglobal Telecom Alliance ("TTA"), another long distance customer, TTA requested the same rates as those received by Global. AT&T responded that some of those rates

were "errors" and were being corrected. Moreover, Global has offered statements by AT&T executives of an intent to "kill" the Global deal.

On May 2, 1994, AT&T revised certain of the credit provisions of CT 1119, increasing Global's payment obligation if it exceeded certain usage rates. AT&T argues that this revision was not a modification of the agreement, but a clarification of the terms of one set of the credits and was fully consistent both with the agreement and the intent of the parties. The FCC granted the request for this revision, and AT&T has argued that this grant somehow demonstrates the legality of the revision. Interestingly, however, the FCC's letter to AT&T granting the revision stated: "AT&T should only file these proposed changes if it indicates in the transmittal letter accompanying the filing resulting from this grant that the existing customer(s) have agreed to the changes." Moreover, the FCC's letter further stated: "This grant does not constitute approval by the Commission or Chief Common Carrier Bureau of the proposed filing, and does not prejudice any subsequent action which the Commission or Bureau may take." No one from AT&T requested or obtained the consent of Global for the revision, yet AT&T represented to the FCC that such consent had been given.

On May 4, 1994, AT&T also revised the "availability" clause of CT 1119, stating that the initial customer (i.e., Global) would not be allowed to purchase services under CT 1119 more than once. AT&T's revision of CT 1119 also contained a clause requiring Global to use AT&T's telecommunication services exclusively during the first year of the contract. AT&T's letter to the FCC requesting a grant for that revision states that the proposed revised terms were "inadvertently omitted in the original filing." Global counters that part of the revised language was expressly deleted by Global during negotiations and therefore could not have been inadvertently omitted. AT&T now states that this clause was included as a result of the regulatory requirement that all contract-based tariffs be made available to other similarly situated customers requesting the same

**1072**

service. The FCC's letter granting this revision did not inquire as to whether Global had agreed to this revision.

Shortly after CT 1119 became effective, Global entered into an agreement with its parent corporation, Peoples Telephone Company ("PTC"), which permitted PTC to utilize long distance services under CT 1119. Global sought to negotiate a new CT with AT&T to accommodate additional volumes of service at rates similar to those provided by CT 1119. On or about July 27, 1994, Global submitted a letter to AT&T ordering ten additional CT 1119's to cover its increased usage. AT&T refused those orders on the ground that CT 1119 was not subject to multiple reorder. Over the next few months, the parties tried to negotiate a new deal with respect to Global's increased usage. On or about October 14, 1994, negotiations broke down, and AT&T terminated services to Global as a result of Global's refusal to pay approximately $1 million in long distance service charges. Global argues that AT&T's revisions effectively eviscerated the agreement and constituted a material breach of contract. According to Global, any attempt by AT&T to modify unilaterally CT 1119 was barred by the *Sierra–Mobile* doctrine and was in breach of the agreement. As a result, Global asserts that it was under no obligation to perform under the amended tariff. Global has moved for summary judgment on the issue of the unlawfulness of AT&T's revision to CT 1119 and AT&T's liability for breach of contract (Count III of Global's Complaint).

In opposition to Global's Motion for Partial Summary Judgment and in support of its own motion for summary judgment, AT&T argues that the "filed-tariff" doctrine controls and bars any claims by Global as to the illegality of AT&T's revisions. Alternatively, AT&T argues: (1) that the revisions were mere clarifications and not alterations; and/or (2) that pursuant to the terms of the CT Order, AT&T had the right to make such revisions. As discussed below, AT&T's arguments are without merit and summary judgment in favor of Global is appropriate.

## LEGAL ANALYSIS

For most of this century, telephone service was provided pursuant to a vertically inte-grated monopoly that was approved by government regulators. Prospective competitors struggling to gain a foothold in the market were generally unsuccessful. It was not until the 1970s that the government took its first halting steps to introduce competition to the telecommunications industry. In recent years, more forceful efforts in that direction have been made.

For purposes of the present dispute, the relevant change in federal policy was the introduction of the contract tariff regime to private agreements between common carriers and their customers. Before 1991, private contracts in the telecommunications field were allowed only *between* carriers. Common carriers were allowed to negotiate private agreements with other common carriers for the sale terms of telecommunication services. In order to maintain regulatory oversight over those private agreements and pursuant to Section 211(a) of the Communications Act of 1934, the FCC required that those contracts also be filed as tariffs. Thus were born telecommunications contract tariffs.

Contract tariffs between telecommunications carriers and individual customers only came into existence in 1991. Before that time, carriers were not allowed to negotiate enforceable, private deals directly with individual customers but instead had to deliver service and charge rates exclusively based upon general tariffs filed with the FCC. In 1991, the FCC adopted a contract carriage policy to streamline governmental regulation and to foster competition in the provision of telecommunication services to businesses. Certain rates are still established by general tariffs, but many terms can now be set by private agreement. In instituting this new policy, the FCC made it clear that it intended to promote competition and efficiency:

One important benefit of contract carriage is that it will increase the ability of customers to negotiate service arrangements that best address their particular needs.... Moreover, because the individually negotiated contract arrangements must be made generally available to other similarly situated customers, other customers can reap

the benefits of these new, more specialized arrangements. Of course, to the extent that large customers are able to obtain better or cheaper telecommunications services, their cost of production decreases, which exerts downward pressure on their product prices, to the benefit of all consumers. *Competition in the Interstate Interexchange Marketplace,* 6 F.C.C.R. 5880, ¶¶ 103–104 (1991). Essentially, the question for the Court to decide then is whether these steps taken by the FCC finally to unleash the forces of free enterprise and competition in this area should be given logical effect or should instead be stultified by artificial judicial distinctions.

### 1. *Sierra-Mobile* and the Filed Rate Doctrine

The U.S. Supreme Court has held that in a regulatory regime that permits the relationship between the parties to be established by private contract, a utility may not alter a material term of the parties' agreement without the customer's consent simply by filing a unilateral tariff amendment. *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,* 350 U.S. 332, 338–40, 76 S.Ct. 373, 378, 100 L.Ed. 373 (1956); *Fed. Power Comm'n v. Sierra Pac. Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). This principle has become to be known as the *Sierra–Mobile* doctrine. It dictates the primacy of contract law in determining whether carriers may unilaterally revise agreed-upon rates and terms simply by amending their tariffs. Except in limited exceptions not applicable here, a tariff amendment filed without the customer's consent contrary to the terms of the contract is "a nullity." *Mobile,* 350 U.S. at 347, 76 S.Ct. at 382.

The filed rate doctrine holds that "where a regulated company has a rate for service on file with the applicable regulatory agency, the filed rate is the only rate that may be charged." *Florida Mun. Power Agency v. Power & Light Co.,* 64 F.3d 614, 615 (11th Cir.1995). Simply put, this judicially-created doctrine states that "a tariff filed with the FCC supersedes all other agreements between the parties." *MCI Te-*

*lecomm. Corp. v. Best Tel. Co.,* 898 F.Supp. 868, 872 (S.D.Fla.1994) (J. Moore). Thus, arguments of fraud or mistake are of no merit. A party cannot dispute a filed rate on the grounds that he was fraudulently induced into the contract by representations that the rate would be lower, because customers are presumed to know what the applicable tariff is. *Id.* Application of the filed rate doctrine can at times be harsh, but its justification lies in the principle that carriers should not be able to discriminate against customers in the setting of service rates; one rate—the filed rate—is the applicable rate for all regardless of private agreements to the contrary.

The Court agrees with Global that the *Sierra–Mobile* doctrine controls the resolution of these motions. While an FCC-filed contract tariff is not identical to the contracts that in *Sierra* and *Mobile* were permitted under the Natural Gas Act and Federal Power Act, the FCC has stated that those acts are "similar in several significant respects to the Communications Act," *Bell System Tariff Offerings,* 46 F.C.C.2d 413, 432 (1974), and both the FCC and the courts have universally applied the *Sierra–Mobile* doctrine to telecommunications agreements, in striking down attempts by AT & T and other carriers to alter unilaterally the terms of contract tariffs *between carriers* where the language of the CT Order did not authorize such unilateral amendment. *See Bell System Tariff Offerings,* 46 F.C.C.2d 413, 432 (1974); *Bell Telephone Co. of Pa. v. FCC,* 503 F.2d 1250, 1275–82 (3d Cir.1974); *MCI Telecomm. Corp. v. FCC,* 822 F.2d 80 (D.C.Cir.1987); *MCI Telecomm. Corp. v. FCC,* 665 F.2d 1300 (D.C.Cir.1981). Logic and good sense dictate that the same principles should apply to contract tariffs between carriers and customers. The FCC's contract tariff regime between carriers and customers is, in all material respects, identical to the one governing contract tariffs between carriers, and the Defendant has offered no convincing rationale for treating the two regimes differently. As commentators have stated: "[T]raditional regulatory lines between 'carriers' and 'customers' are rapidly being obliterated. Carriers buy service from each other in large quantities; customers are often value-added

resellers."[1] In short, no logical justification exists for treating agreements between carriers and customers differently from agreements between carriers.

Moreover, the entire justification for implementing the 1991 changes would be defeated without the protection of the *Sierra–Mobile* doctrine. As discussed above, the FCC made clear in its August 1, 1991 Report and Order that the contract tariff regime promotes efficiency (by allowing specially tailored, personalized contracts) and competitive pricing (by making negotiated contracts generally available to similarly situated customers). If a common carrier such as AT & T could simply amend its filed contract tariffs and alter the terms of the contract—for example, when it realizes that it has given too good a deal to one customer and does not wish to offer such terms to other similarly situated customers—then the FCC's stated goals would be frustrated, and the contract tariff regime rendered meaningless. Indeed, AT&T's actions in unilaterally altering CT 1119 would seem to be just the kind of "anticompetitive" and "undesirable behavior" that the FCC sought to prevent by instituting the contract tariff regime in the first place. *Competition in the Interstate Interexchange Marketplace*, 6 F.C.C.R. 5880, at ¶ 102 (1991).

Third, by prohibiting the unilateral amendment of contract tariffs, the Court is not, as AT&T suggests, disregarding the filed rate doctrine. Rather, the Court's decision in fact promotes the policy concerns underlying that doctrine. The filed rate doctrine's principle of non-discrimination is furthered because the filed contract tariffs become public information, and the carrier offering such terms is bound by them in negotiating with other customers. *See Competition in the Interstate Interexchange Marketplace*, 6 F.C.C.R. 5880, at ¶ 91 (1991).

Finally, the present holding does not in any way weaken the FCC's regulatory authority over telecommunications tariffs because even under *Sierra–Mobile* doctrine, exceptions do exist where the FCC, for the public good, can authorize a unilateral rate change. *Sierra*, 350 U.S. at 353, 76 S.Ct. at 372; *Mobile*, 350 U.S. at 344, 76 S.Ct. at 381. Indeed, the FCC already seems to be working under the assumption that the *Sierra–Mobile* doctrine applies, as evidenced by its warning to AT&T that any amendment to CT 1119 required Global's consent.

Still, AT&T tries to argue that the filed-rate doctrine somehow precludes the application of the *Sierra–Mobile* doctrine and instead justifies AT&T's amendments to CT 1119. It is at this point, that AT&T's arguments confuse two separate issues. AT&T downplays the contractual nature of contract tariffs and stresses that they are, after all, filed tariffs. Citing filed rate doctrine language, AT&T states that "telecommunications common carriers providing service to customers under ... contract-based tariffs remain free, as a matter of law, to alter or 'abrogat[e]' carrier-customer contracts with *inconsistent* tariff filings.'" Def.'s Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 7 (quoting *Competition in the Interstate Interexchange Marketplace*, 6 FCC Rcd. 5880, 5897, 5902 (1991)) (emphasis added). Likewise, AT&T goes on to quote language stating: "It is a well-established principle that when a filed tariff rate *differs* from a rate set in a carrier-customer contract, the tariff rate is the legal rate." *Id.* (emphasis added). AT&T offers these quotations as support for the "supremacy of revisions to contract-based tariffs." This argument is misleading. AT&T's citations merely stand for the proposition that a private contract can be abrogated if it is *inconsistent* with the contract tariff as filed or with rates already on file with the FCC. Clearly, this is not the issue here. Global is not arguing that CT 1119 was in-

---

1. Indeed, this case demonstrates how futile such a distinction would be. AT&T admits that Global was a reseller by virtue of its agreement with People's Telephone Company and others. As the FCC stated in a 1976 decision endorsing resale, resale is "a common carrier activity" under the Communications Act. *Regul. Pol. Concern. Resale and Shared Use*, 60 F.C.C.2d 261, 303–308,

316 (1976). Thus, even if the Court were to draw the artificial distinction that AT&T seeks, the *Sierra–Mobile* doctrine would still likely prohibit the unilateral revision of CT 1119 because Global seems itself to meet the Act's definition of common carrier. *See* 47 U.S.C. § 153(h) and 47 C.F.R. § 21.2.

consistent with the initial agreement of the parties. Nor has AT&T argued that CT 1119 as originally drafted was inconsistent with any general AT&T tariffs on file with the FCC. If anything, the filed rate doctrine weakens AT&T's case because it prevents AT&T from arguing that the amendments to CT 1119 were inadvertent omissions. Finally, any attempt by AT&T to argue that the filed tariff doctrine precludes Global from challenging CT 1119 *as amended* is also without merit because, as the Supreme Court has stated, any unilateral revision of a tariff in violation of *Sierra–Mobile* doctrine, even if approved by the FCC, is "a nullity." *Mobile,* 350 U.S. at 347, 76 S.Ct. at 382. In short, a contract tariff is a contract first and a tariff second. As the D.C. Circuit stated: "Contracts and tariffs are not always mutually exclusive, but may be used in concert to define the relationship of the parties. In such circumstances, the contract governs the legality of subsequent tariff filings. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid." *MCI Telecomm. Corp. v. FCC,* 665 F.2d 1300, 1302 (D.C.Cir.1981) (citations omitted).

The Court concludes that the *Sierra–Mobile* doctrine controls despite the fact that no case was found directly addressing the applicability of *Sierra–Mobile* to the exact facts here. This is no doubt because the FCC's policy change is so recent. With one exception, all of the cases cited by AT&T were decided before 1991, when the FCC first authorized private agreements between carriers and customers, and are therefore inapposite. The one post–1991 authority that AT&T cites, a 1995 FCC Order, is equally unpersuasive. In *AT & T Communications Contract Tariff No. 360,* 1995 WL 334935 (F.C.C. June 5, 1995), the FCC addressed the unilateral revisions to a contract tariff. There, AT&T had entered into an agreement with Interworld Communications Corp. ("ICC") and filed that agreement as Contract Tariff 360. A similarly situated customer, MCI Communications Corp. ("MCI"), ordered service under Contract Tariff 360 during its 90 day period of availability and began to receive service pursuant to that order. In keeping with its by now familiar pattern,

after receiving the MCI order, AT&T sought to amend Contract Tariff 360 to raise many of its rates. The FCC suspended those amendments under its "substantial cause" analytic standard, stating that it had serious doubts whether AT&T could demonstrate that the unilateral amendments were "just and reasonable," and ordering a further investigation. *Id* at ¶¶ 19–22. The FCC declined to apply the *Sierra–Mobile* doctrine there, finding it "inapplicable in this instance." *Id.* at ¶ 11. The Commission went on to state:

> [The *Sierra–Mobile* ] doctrine establishes the legal standard under which a carrier unilaterally may modify a contract that the carrier entered into with a single customer by subsequently filing an inconsistent tariff. Although the Commission has applied the *Sierra–Mobile* doctrine in cases involving telecommunications common carriers, the present case is distinguishable from those cases because this offering was made generally available to all similarly situated customers during several 90–day windows of opportunity. Unlike *Sierra–Mobile,* the contract tariff in the present case is not a private agreement, made available to a single customer. Rather, Contract Tariff 360 was a generally available tariff filed with the Commission. The fact that the initial customers, ICC and MCI, were both carriers is not relevant in these circumstances. The key facts are that the terms and conditions contained in Contract Tariff 360 were made generally available to all similarly situated customers and that MCI ordered service during a subsequent window of availability.

AT&T argues that this language supports AT&T's position that Sierra–Mobile does not apply to contracts between carriers and customers. The Court disagrees. First, the facts of *AT & T Communications Contract Tariff No. 360* are clearly distinguishable from the present case. Here, the party seeking to annul the unilateral amendments is the initial customer, Global, and not an outside party seeking to take advantage of the availability of a previously-negotiated agreement. To that extent, the original contract between AT&T and ICC *was* a private

agreement, and there is no indication in the FCC's opinion that AT&T could have amended the terms of Contract Tariff 360 *as against ICC.* For the reasons stated above, the Court believes that such a revision would be prohibited by the *Sierra–Mobile* doctrine. AT&T's interpretation of the FCC's opinion in *AT & T Communications Contract Tariff No. 360* would produce an illogical result: If the FCC really intended to say that any contract tariff that is generally available to all similarly situated customers can be unilaterally amended as against any customer to the contract, then *Sierra–Mobile* would have no application at all to telecommunications service agreements because, under FCC rules, all contract tariffs must be made available to other similarly situated customers. Certainly, this result would conflict with previous FCC opinions and the long line of federal court decisions applying *Sierra–Mobile* to private telecommunications agreements.

## 2. Whether the language of the CT Order authorizes unilateral revision of CT 1119

In the alternative, AT&T tries to argue that even if the *Sierra–Mobile* doctrine applies, the language of the Contract Tariff Order itself authorizes the unilateral revision of CT 1119. Specifically, AT&T points to Paragraph 1 of the CT Order which states:

Services will be provided in accordance with the rates terms and conditions described in Attachment A [GLOBACC] and, except as provided in Attachment A, the rates, terms and conditions in applicable tariffs pertaining to services provided under this agreement, *applicable tariffs are the AT&T tariffs referenced in Attachment A, as such tariffs may be revised from time to time.*

(emphasis added). AT&T further cites the language in Paragraph 10 of the CT Order stating: "No change modification or waiver of any terms of this Agreement, *except for revisions to the tariffs cited in Attachment A,* shall be binding unless reduced to writing and signed by both parties hereto." (emphasis added). According to AT&T, this language not only contemplates revision of CT

1119, but also expressly authorizes AT&T to make such revisions unilaterally.

The Court disagrees. As noted above, GLOBACC (the model which became CT 1119) incorporates by reference several general tariffs already filed by AT&T with the FCC. As discussed, AT&T can revise unilaterally its general tariffs. Thus, the language of the CT Order cited by AT&T merely reiterates that the rule against unilateral revision of any terms of the agreement does not apply to those general tariffs incorporated by reference. The revisions which Global alleges were in breach of the parties' contract were revisions to the contractual rates to which the parties had agreed, *not* to the general tariffs that CT 1119 incorporates by reference. Thus, there is no support for AT&T's argument that the language of the CT Order authorized AT&T's amendments to Ct 1119.

## 3. Whether AT&T's amendments altered CT 1119 or were mere clarifications

AT&T has made several somewhat conflicting statements in support of the legality of its amendments to CT 1119. It has argued that the amendments to 1119 were: consistent with CT 1119, clarifications of the original intent of the parties, and/or inadvertent omissions. None of these arguments has merit.

First, as Global points out in its Motion *in Limine* to Preclude Defendant AT&T from Introducing Evidence of any Pre–Contract Negotiations as a Purported "Clarification" of the Parties' Intentions under CT 1119, both the filed rate doctrine and the parol evidence rule preclude AT&T from raising any argument that AT&T's revisions of CT 1119 were made in order to give effect to the understanding of the parties when they entered into the agreement. As the merger/integration clause in Paragraph 10 indicates, the CT Order was intended to supersede all previous agreements between the parties. Moreover, its terms are unambiguous. Thus, parol evidence should not be heard to clarify the intent of the parties. *J.M. Montgomery Roofing Co. v. Fred Howland,* 98 So.2d 484 (Fla.1957); *Kraft v. Ma-*

*son,* 668 So.2d 679 (Fla.Dist.Ct.App.1996). AT & T has itself made this argument in its Motion for Summary Final Judgment as to Global's Fifth Amended Complaint and should not now be allowed to argue otherwise. Moreover, the filed rate doctrine precludes any arguments that the terms AT&T added to CT 1119 were inadvertently omitted from the original version.

 Finally, any attempt by AT&T to argue that its amendments were consistent with CT 1119 is equally unavailing. Its first revision, among other things, raised by 1% the rate that Global was obligated to pay for usage above a certain volume. Its second revision, the availability revision, added a "one per customer" limitation and added a one-year exclusive dealing clause.[2] Thus, even a superficial examination of AT&T's amendments to CT 1119 makes it clear that they substantially altered the terms of the parties' agreement in AT&T's favor and to the detriment of Global.

### CONCLUSION

In recent years, Congress and the FCC have attempted to streamline the regulations governing commercial behavior in the telecommunications sector and to increase the level of competition in the sale of telecommunications services. The FCC's introduction of a contract carriage regime is an important step towards those goals. AT&T, traditionally dominant, is understandably intent on slowing the move to increased competition, and the position it urges the Court to adopt now would effectively eviscerate the FCC's 1991 change in policy.

The *Sierra–Mobile* doctrine was intended to validate private agreements in the face of attempts such as those here to avoid their terms. The rationale of the *Sierra* and *Mobile* decisions applies equally to the regulation of telecommunication services, and courts have not hesitated to apply that doctrine to telecommunications agreements. The Court rejects AT&T's contention that an exception should be made where the agreement is between a carrier and a customer. Such an artificial distinction has no basis in law or logic. There is simply no point to instituting a system that permits the formation of private contracts if the terms of those contracts can be unilaterally amended by one of the parties. The FCC has purposely set the relationship between telecommunications providers and customers on a path towards greater private flexibility and control. Such a policy is well within the authority of the FCC's mandate, and it would not be judicious on the part of this Court to thwart those efforts.

Therefore, the Court holds that the *Sierra–Mobile* doctrine applies to private agreements between common carriers and customers filed as contract tariffs. Accordingly, AT&T had no right to amend unilaterally the terms of CT 1119, and by doing so, AT&T materially altered the terms of its agreement and breached its contract with Global. Thus, it is

ADJUDGED that Plaintiff's Motion for Partial Summary Judgment (**docket no. 320**) is GRANTED. Judgment shall be entered in favor of Plaintiff Global as to Count III of the Fifth Amended Complaint. Further, it is

ADJUDGED that Defendant's Motion for Summary Judgment as to Liability Regarding its Amended Counterclaim (**docket no. 445**) is DENIED.

---

**2.** AT&T argues that a "one per customer" limitation was already clear from the original language of the availability clause which stated that the terms of CT 1119 were "available to any similar situated customer that ordered service within ninety (90) days after the effective date...." The Court's reading of that language is that Global is obviously a "similar situated customer" and should itself be able to order additional service under CT 1119 within the 90 day effective period. But, even assuming that that language does contain the one per customer limitation that AT&T was attempting to clarify with its second amendment of CT 1119, other terms were added in the second amendment that are patently inconsistent with the original terms of CT 1119, e.g., the one-year exclusive dealing clause.